[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 03-13682

_____

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
August 10, 2004
THOMAS K. KAHN
CLERK

D. C. Docket No. 85-00665-CV-T-N

JOHNNY REYNOLDS, individually and on
behalf of himself and as representative
of a class of black employees of the
Highway Department, State of Alabama,
similarly situated,

Plaintiffs-Appellants,

CECIL PARKER,
ROBERT JOHNSON,
FRANK REED,
OUIDA MAXWELL,
MARTHA ANN BOLEWARE,
PEGGY VONSHERIE ALLEN,
JEFFERY W. BROWN,

Intervenor-Plaintiffs-
Appellants,

WILLIAM ADAMS,
on behalf of himself and all
similarly situated persons
(Non-Class Employees), et al.,

Intervenor-Plaintiffs,
Appellees,

versus

JOE MCINNES,
in his official capacity as Director
for the Alabama Department of Transportation,

HALYCON VANCE BALLARD,
individually,
TOMMY G. FLOWERS, as Director of
Personnel Department, State of Alabama, et al.,

Defendants,

DEPARTMENT OF TRANSPORTATION, STATE OF ALABAMA,
DEPARTMENT OF PERSONNEL, STATE OF ALABAMA,
THOMAS G. FLOWERS,
Interim Director of the State
Personnel Department,
ROBERT RENFROE RILEY,
in his official capacity as
Governor of the State of Alabama,
JOE MCINNES,
in his official capacity as
Director of the Alabama
Department of Transportation,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Middle District of Alabama

_____

**(August 10, 2004)**

Before BARKETT and HILL, Circuit Judges, and FORRESTER[*], District Judge.

BARKETT, Circuit Judge:

This case is the latest in a long line of appeals stemming from a 1985

---

[*] Honorable J. Owen Forrester, United States District Judge for the Northern District of Georgia, sitting by designation.

employment discrimination lawsuit brought by a class of African-American employees and applicants against the Alabama Department of Transportation ("ALDOT"). In January 1994, a group of white ALDOT employees moved to intervene for purposes of challenging the race-conscious aspects of a proposed consent decree between the African-American plaintiffs and ALDOT. The district court granted the motion and subsequently certified an additional class consisting of non-African-American ALDOT employees (the "Adams intervenors"). In March 1994, the district court signed a consent decree that incorporated certain race-neutral provisions insisted upon by the Adams intervenors and accepted by both plaintiffs and ALDOT ("the Consent Decree").[1] Disputes over the enforcement of this decree have spawned continuing litigation in the decade since 1994. In this case, we are asked to decide whether the district court had

---

[1] The March 1994 Consent Decree was identified in one of our earlier rulings in this lawsuit as "Consent Decree I":

> By late February 1994, the plaintiffs and the Department decided to the divide the previously proposed decree into three parts, called Consent Decrees I, II, and III. Consent Decree I contained the provisions that all sides agreed provided only race-neutral prospective relief. Consent Decrees II and III contained provisions that were acceptable to the plaintiffs and the Department, but opposed as race-conscious by the Adams Intervenors.

Reynolds v. G.M. Roberts, 207 F.3d 1288, 1293 (11th Cir. 2000). Consent Decrees II and III have never been approved by the district court and are not at issue in this litigation. As noted below, however, it is not accurate to describe the March 1994 Consent Decree as completely "race-neutral."

jurisdiction to refer to a special master a contempt motion[2] filed by the Adams

intervenors to require ALDOT to comply with Article 15 of the Consent Decree.[3]

Article 15 commits ALDOT to take affirmative steps towards the

"reclassification and reallocation" of "[a]ll employees then working for the

[Alabama] Highway Department" (which is now ALDOT). Consent Decree

Article 15 ¶ 1(a). Specifically, Article 15 entitled each ALDOT employee to

complete a form listing the job duties she was performing and the percentage of

time she spent on each duty. Each employee whose form indicated that she was

spending a majority of her time performing duties associated with a higher job

classification was to be reclassified to the higher level (provided that the ALDOT

Personnel Department's classification review and plans permitted the

reclassification). Consent Decree Article 15 ¶ 1(b). These procedures were also

made available to all "laborers who are working at [ALDOT]." Consent Decree

Article 15 ¶ 1(c-e). In June 1997, the district court ordered that the proper date on

---

[2] The motion at issue is entitled "Adams Intervenors' Motion for Contempt Enforcement through Race-Neutral Means" and was filed with the district court on September 20, 1999. This same motion is referenced in both of the district court's April 30, 2003 referral orders ("Article Fifteen Referral Order" and ""Individual-Civil-Contempt-Claims Referral Order") now under review.

[3] We review a district court's referral of issues to a special master for abuse of discretion. See Grilli v. Metropolitan Life Insurance Co., 78 F.3d 1533, 1538 (11th Cir. 1996); Gary W. v. State of Louisiana, 601 F.2d 240, 245 (5th Cir. 1979). We review questions of jurisdiction de novo. Williams v. Best Buy, Co., 269 F.3d 1316, 1318 (11th Cir. 2001).

which to evaluate employees' duties for purposes of Article 15 reclassification is March 16, 1994, the date of the Consent Decree's entry. See Order of June 16, 1997 and Memorandum Opinion of June 19, 1997.

The reclassification procedures of Article 15, however, are not entirely "race-neutral." The Article includes additional provisions designed to guarantee that newly available openings in any given classification would be filled by qualified African-American candidates,[4] and to ensure that any restructuring of ALDOT job levels pursuant to the Consent Decree will not take place at the expense of ALDOT's black employees.[5]

---

[4] Paragraph 2 of Article 15 provides:

A permanent opening in a classification may not be filled by reallocation when a black eligible is on the register for the class to which the position is being reallocated and such black eligible is (a) ranked higher or tied on the Register with the person to be reallocated or (b) would appear on a COE [Certificate of Eligibles] form from that Register if the person to be reallocated were ranked first on the COE.

[5] Paragraph 3(a) of Article 15 calls for the State Personnel Department to undertake a job classification study "encompassing the job classifications at [ALDOT] in a multi-grade series" (commencing with such positions as civil engineers and highway maintenance technicians). Paragraph 3(b) provides that if the job classification study reveals that the existing job levels do not reflect "actual differences in duties, responsibilities, or qualifications," the job levels are to be restructured to reflect the actual differences revealed by the study. Paragraphs 3(c) & (d) provide:

Any restructuring of multi-grade jobs will likely involve reducing the number of grades and broadening the pay ranges within the newly defined classification[s]. Such restructuring shall be implemented in a way that the opportunities for black employees to advance, and for the defendants to achieve the goals and purposes of this Decree, are enhanced and not diminished.

5

On September 20, 1999, the Adams intervenors moved the district court to order ALDOT to show cause why it should not be held in contempt for failure to comply with the reclassification and certain other provisions of Article 15. On April 30, 2003, in order to expedite the conclusion of this litigation, the district court referred this and other motions to a special master.

Having considered this record and the arguments of counsel, we conclude that the Adams intervenors do have standing to bring civil contempt claims against ALDOT on the basis of the Consent Decree.[6] The Adams intervenors and plaintiffs alike seek enforcement of the reclassification provisions of the Consent Decree. The plaintiffs, defendants, and intervenors all consented to these provisions in March 1994. The Adams intervenors point in particular to ¶¶ (1) and (3)(d) of Article 15. As noted above, ¶ (1) is entirely race-neutral and provides that "[a]ll employees then working for [ALDOT] in the classified service" will be given

---

In the event that the study results in the consolidation of classes (e.g., HMT-1 and HMT-2), all persons will be assigned to pay ranges appropriate to their years of service, provided that black employees shall not be downgraded or have a reduction in pay as a result of the reclassification study unless it is demonstrated by [ALDOT] that they have not performed after being given the opportunity to do so, and are not capable of performing with reasonable training, the duties and responsibilities of the job classification to which they are assigned.

[6] Plaintiffs argue that the district court erred in referring the Adams intervenors' contempt claims to a special master before deciding for itself whether it had subject matter jurisdiction. Our holding that the Adams intervenors, for the reasons stated below, have standing to enforce the consent decree against ALDOT also resolves the jurisdictional question. The district court has jurisdiction to refer the Adams intervenors' claims to a special master because the intervenors have standing to bring those claims in the first place.

the opportunity to be reclassified into a higher job classification. Nothing in this language excludes the Adams intervenors from availing themselves of the reclassification procedure. As for the reassignment process of ¶ 3(d), provided that the safeguards accorded African-American employees and quoted in footnote 5 above are respected, nothing in this paragraph bars the Adams intervenors from seeking enforcement of this part of the Consent Decree as well.

No Supreme Court or Eleventh Circuit case has squarely decided the specific question of whether a person, once allowed to intervene for purposes of challenging some or all of the provisions of a consent decree, then has standing to seek enforcement of that decree against parties clearly bound by it (the plaintiffs and defendants). Our reading of the most relevant precedents suggests no clear standing obstacles to the Adams intervenors in the circumstances of this particular case. By contrast, these precedents do suggest that, by virtue of having been permitted to intervene in the proceedings that led to the Consent Decree, the Adams intervenors "have legal rights at stake in this litigation." Reynolds v. G.M. Roberts, 251 F.3d 1350, 1357 n.12 (11th Cir. 2001) ("Reynolds III"). By not allowing the Adams intervenors to bring civil contempt claims against ALDOT for failure to enforce the reclassification provisions of the Consent Decree, moreover, we would effectively be rewriting the decree so as to make those provisions

7

available only to African-American employees.  See Reynolds v. G.M. Roberts, 207 F.3d 1288, 1301 (11th Cir. 2000) ("Reynolds II").[7]

In Davis v. Butts, 290 F.3d 1297, 1300 (11th Cir. 2002) ("Reynolds IV") and Reynolds v. Butts, 312 F.3d 1247, 1249 (11th Cir. 2002) ("Reynolds V"), we noted that "racial discrimination was the focus of the Reynolds litigation."  Davis, 290 F.3d at 1300; Reynolds V, 312 F. 3d at 1250 ("The record is clear that the focus of this case is racial discrimination").  But the Adams intervenors' civil contempt claims at issue here are not claims of reverse discrimination.  Their immediate claims are based, not on the Equal Protection Clause of the Constitution or on Title VII, but on the Consent Decree.  In Reynolds V, we held that white non-members of the Adams intervenor class did not have standing to enforce the Consent Decree against ALDOT "[b]ecause [they] are neither parties to the consent decree nor named representatives or intervening members of a class in the litigation."  Reynolds, 312 F.3d at 1247.  This is clearly not the case here, and so Moore v. Tangipahoa Parish School Board, 625 F.3d 33 (5th Cir. 1980), upon which we relied in both Reynolds IV and V, does not apply.

Even if it did apply, however, the underlying analysis of Moore argues for

---

[7] In Reynolds II, we held that the Consent Decree could only be enforced through the district court's civil contempt power, not by way of temporary restraining orders or injunctions. See also N. H. Newman v. Alabama, 683 F.2d 1312, 1318 (11th Cir. 1982).

rather than against a finding of standing for the intervenors in this appeal. In Moore, we held that a white school teacher did not have standing to enforce a court order against a school board where the order was framed so as to establish a racially-neutral school system. The school teacher in that case alleged that she had been discriminated against on the basis of a political agenda. Acknowledging that Fed. R. Civ. P. 71 provides that "[w]hen an order is made in favor of a person who is not a party to the action, that person may enforce obedience to the order by the same process as if a party," we nonetheless found that the white school teacher was not within the "zone of interests" protected by the district court's order. Moore, 625 F.2d at 34 (quoting Association of Data Processing Service Organizations, Inc. v. Camp, 397 U.S. 150, 153 (1970)). By contrast, as noted above, the reclassification provisions of the Consent Decree relied upon by the Adams intervenors in this case are race-neutral (though, to repeat, Article 15 also provides that race-neutral reclassification shall not come at the expense of ALDOT's African-American employees). The Adams intervenors are within the "zone of interests" that the Consent Decree was designed to protect.

Finally, we note that the Supreme Court's Title VII jurisprudence does not bar the Adams intervenors from bringing their civil contempt claims. In the aftermath of Martin v. Wilks, 490 U.S. 755 (1989) and other decisions, Congress

9

promulgated the Civil Rights Act of 1991, which amended Title VII to provide that

> [n]o order of the [district] court shall require . . . the hiring, reinstatement, or promotion of an individual as an employee . . . if such individual . . . was refused employment or advancement . . . for any reason other than discrimination on account of race, color, religion, sex, or national origin. . .

42 U.S.C. § 2000e(5). In Local Number 93, International Ass'n of Firefighters v. Cleveland, 478 U.S. 501, 515 (1986), however, the Court held that a consent decree is not an "order" within the meaning of the provision just quoted. Thus, Title VII does not prevent a district court from approving a consent decree that requires a defendant to advance an employee for a reason other than racial discrimination. And if a district court is permitted to enter a consent decree to this effect, we see no basis in Title VII or elsewhere for prohibiting the court from issuing any subsequent orders necessary to enforce such a decree.

We thus find no error in the district court's referral of the Adams intervenors' motion for contempt enforcement to a special master who, in accordance with the court's previous order of June 16, 1997, shall implement the Article 15 reclassification in light of the relevant employees' job duties as they existed on March 16, 1994.

AFFIRMED.

10