[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 08-14371
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
FEBRUARY 23, 2010
JOHN LEY
CLERK

D. C. Docket No. 03-03132-CV-UWC

GENEVA BROWN,

Plaintiff-Appellee,

versus

ALABAMA DEPARTMENT OF TRANSPORTATION, et al.,

Defendants-Appellants.

_____

Appeal from the United States District Court
for the Northern District of Alabama

_____

(February 23, 2010)

Before MARCUS, FAY and ANDERSON, Circuit Judges.

MARCUS, Circuit Judge:

This appeal arises from a Title VII claim brought by African-American civil engineer Geneva Brown against her employer, the Alabama Department of Transportation ("the Department").[1] Brown claimed that the Department denied her nine separate promotions on account of her race, or for retaliatory reasons, between 2000 and 2005. Following a five-day trial, a jury sitting in the Northern District of Alabama entered a verdict in Brown's favor as to her claims of discrimination and retaliation, and awarded her backpay on the basis of each of the nine challenged promotions.

On appeal, the Department argues that the district court erred in denying its motion for judgment as a matter of law and remittitur. It claims that the evidence of discrimination and retaliation was insufficient with respect to all of the promotions, and that even if the evidence was sufficient as to some, the backpay award was excessive insofar as it took each of the promotions into account. The Department also challenges the terms of the district court's permanent injunction, which ordered that Brown be promoted to the position of Division Engineer for the Third Division and provided for other interim relief. The Department claims that

[1] Brown was joined in the district court by co-plaintiff Rosyln Cook-Deyampert, an African-American civil engineer who claimed that she was denied promotions on the basis of her race and ultimately terminated for similar reasons. Cook-Deyampert settled her grievance with the Department and is not a party to this appeal. The Department, for its part, is joined in this appeal by two of its employees as co-defendants -- Fifth Division Engineer L. Dee Rowe and Department of Transportation Director Joe McInnes -- who were sued in their official capacities.

the injunction failed adequately to specify the position that Brown would hold pending her promotion to the Third Division Engineer position, exceeded the scope of the district court's remedial powers under Title VII, and required the Department to violate Alabama law by placing Brown in a position for which she was legally unqualified.

After thorough review, we conclude that the evidence of discrimination and retaliation was sufficient to support only three of the nine challenged promotional decisions, and that the backpay award therefore must be recalculated. We also hold that the injunction, while clear in most respects, failed to specify adequately the interim position that Brown was to hold pending a vacancy in the Third Division Engineer position. Accordingly, we affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

## I.

The relevant history of this case begins long before the promotional decisions challenged here by Geneva Brown, and even considerably before Brown joined the ranks of the Alabama Department of Transportation in 1977. It stretches back to at least June 1968, when the United States commenced a large civil rights action known as the <u>Frazer</u> litigation against six Alabama state agencies. <u>See</u> <u>United States ex. rel. Mitchell v. Frazer</u> ("<u>Frazer I</u>"), 317 F. Supp. 1079 (M.D. Ala. 1970). Although not one of the original defendants, the Department of

3

Transportation (then the State Highway Department, <u>see</u> Ala. Code. § 23-1-20) was joined not long after the initial filing, along with every other state agency in Alabama save for the Department of Public Safety. <u>See</u> <u>United States v. Frazer</u> ("<u>Frazer II</u>"), Civ. No. 2709-N, 1976 WL 729 (M.D. Ala. Aug. 20, 1976).

As a prelude to <u>Frazer</u>, federal officials repeatedly but unsuccessfully had urged Alabama to adopt a regulation expressly prohibiting discrimination on the basis of race. <u>Frazer I</u>, 317 F. Supp. at 1084-85. Alabama had fallen behind other states in doing so, <u>id.</u> at 1085, and indeed, its state-wide hiring and promotion system vested in "the appointing officer . . . the right to reject an applicant because of his race." <u>Id.</u> With little appreciable progress in addressing discrimination, the federal government filed suit.

After reviewing a substantial corpus of evidence, the district court in <u>Frazer</u> found that the six state agencies named as defendants in the original complaint had engaged in extensive pattern-and-practice workplace discrimination against African-American candidates on the basis of their race. <u>Id.</u> at 1086-90. The district court identified, <u>inter alia</u>, the following discriminatory practices: repeatedly passing over African-American candidates for open positions, usually without ever contacting or interviewing them, while giving white applicants with equal or inferior qualifications numerous contacts, interviews, and job offers, <u>id.</u> at 1986-87; placing African-American candidates on the inactive part of the

4

employment register from which candidates were drawn, without ever giving them notice of such placement or ever again certifying them for vacant positions, id. at 1087; enforcing a policy of keeping all African-American employees within certain clerical classifications, id. at 1088; and recruiting almost entirely from predominantly white high schools and colleges, to the exclusion of all but a few predominantly black institutions, id. at 1089.

The result of these practices, the district court found, was a staggeringly low number of African-Americans in the ranks of the six defendant agencies. Only one out of a thousand of the defendants' clerical employees was African-American -- despite an abundance of qualified African-American candidates and a pressing need to fill clerical vacancies -- and only 26 of 1,104 professional or semi-professional employees were African-American. Id. at 1087. With the goal of remedying the disproportionately low numbers of African-Americans in the civil service ranks, the district court entered a broad injunction targeting each of the identified discriminatory practices. Id. at 1090-93.

Six years later, following the joinder of nearly every state agency in Alabama, the district court reviewed additional evidence of discrimination -- including evidence from the Department of Transportation -- as well as indications that all of the defendants were violating the earlier injunction. Frazer II, 1976 WL 729, at *1. This time, the district court found that "systematic discrimination

against black citizens of Alabama ha[d] been as extensive among the new defendants as it had been among the original defendants." Id. It also found that the State's use of employment tests bearing a questionable relationship to job qualifications had severely prejudiced African-American employees, and that "the new defendant state agencies ha[d] generally avoided compliance with the decrees in this case by examining job registers maintained by the Personnel Department of the State of Alabama and by requesting certificates of eligibility only at times when no blacks were available for certification." Id. at *4. On August 20, 1976, the district court entered a second sweeping injunction targeting the discriminatory practices identified in both the first case and its successor. Id. at *6-8.

Around this time, Geneva Brown was a student in the civil engineering program at the University of Alabama, where she eventually completed three and a half years towards her civil engineering degree before quitting the program when her mother became ill and died.[2] She was hired by the Department of Transportation in 1977, directly on the heels of the second Frazier injunction. With the help of the Frazer orders, she became among the first African-Americans in the civil engineering line-of-promotion. Throughout her long tenure at the Department, she rose through all levels of the Engineering Assistant classification

---

[2] We recite the evidence in a light most favorable to Geneva Brown, who prevailed at trial. Webb-Edwards v. Orange County Sheriff's Office, 525 F.3d 1013, 1029 (11th Cir. 2008).

6

series and ultimately to the position of Civil Engineer in 1988, and of Civil Engineer Manager in 1998.  But the discrimination that drove the <u>Frazer</u> litigation did not end with her hiring, and instead continued to severely hamper her efforts at promotion.

Brown became a class member in a second discrimination lawsuit filed in 1985 by Johnny Reynolds and other African-Americans alleging that the Department of Transportation continued to discriminate on the basis of race, in violation of the <u>Frazer</u> orders.  She was an active and vocal participant in the <u>Reynolds</u> litigation, testifying in various proceedings on at least four occasions between 1992 and 2004.  In 1994, the parties in <u>Reynolds</u> reached a partial settlement and entered into a consent decree providing for extensive injunctive relief.[3]  Brown, however, continued to experience difficulties in her effort to

---

[3] This relief included, inter alia: an expansive recruitment program geared towards African-American candidates; limitations on the use of minimum job qualifications and a requirement that any objective qualifications be validated according to standardized procedures; strict limitations on the procedures by which a candidate's name could be purged from the employment registers; a requirement that the Department request certificates of eligible candidates in a prompt and consistent fashion; an explicit prohibition on avoiding black candidates by cancelling requests for certifications of eligible candidates, returning certifications, requesting the abolition of registers of eligible candidates, delaying requests for certifications, or by other means; and a requirement that blacks be included, to the extent practicable, on interview teams and among decisionmakers.  <u>Reynolds v. Ala. Dep't of Transp.</u>, Civ. A. No. 85-T-665-N, 1994 WL 899259 (M.D. Ala. Mar. 16, 2004).  The fallout of the <u>Reynolds</u> litigation, and in particular the consent decree, was considerable, and has resulted in a number of published decisions by this court.  <u>See</u> <u>Reynolds v. McInnes</u>, 380 F.3d 1303 (11th Cir. 2004) ("<u>Reynolds VIII</u>"); <u>Reynolds v. McInnes</u>, 338 F.3d 1221 (11th Cir. 2003) ("<u>Reynolds VII</u>"); <u>Reynolds v. McInnes</u>, 338 F.3d 1201 (11th Cir. 2003) ("<u>Reynolds VI</u>"); <u>Reynolds v. Butts</u>, 312 F.3d 1247 (11th Cir. 2002) ("<u>Reynolds V</u>"); <u>Davis v. Butts</u>, 290 F.3d 1297, 1300 (11th Cir. 2002) ("<u>Reynolds IV</u>"); <u>Reynolds v. Roberts</u>, 251 F.3d 1350 (11th Cir. 2001)

7

advance to positions in two upper-level engineering classifications -- the Civil Engineer Administrator ("CEA") and Civil Engineer Senior Administrator ("CESA").  She filed the Title VII discrimination and retaliation action underlying this appeal in 2003, and the cause was tried to a jury over three days in September 2006.  Beyond the essential background to Brown's claims, which included much of the history of the Frazer and Reynolds litigation, the following relevant facts emerged at trial.

At least on paper, promotion at the Department follows a series of mandatory steps, essentially all of which were in place at the time of the events in question here.  To fill vacancies within various employment classifications, the Alabama State Personnel Department ("SPD") maintains registers of employees who have demonstrated their qualification for the position, typically in the form of a qualifying test score.  From the appropriate register, SPD draws a list known as a Certificate of Eligibles ("Certificate"), which contains the top ten candidates ranked either in bands of similar scores or from the highest score to the lowest. The Certificate is sent to the Department, whose choice of candidates is limited to

("Reynolds III"); Reynolds v. Roberts, 207 F.3d 1288 (11th Cir. 2000) ("Reynolds II"); Reynolds v. Roberts, 202 F.3d 1303 (11th Cir. 2000) ("Reynolds I").  In Reynolds II, we held that "if in the future . . . any employee . . . suffers racial discrimination in the work place, the employee's remedy (if the grievance cannot be resolved) will be to seek relief in a separate lawsuit, brought in state or federal court."  207 F.3d at 1301 (emphasis omitted).  The instant lawsuit followed procedurally from that holding.

8

those listed on the Certificate. The Department must then constitute a bi-racial interviewing team, send letters of availability to each applicant on the Certificate, interview each interested candidate by asking the same set of questions and rating the answers, and recommend a candidate to the appropriate Bureau Chief or Division Engineer for approval. The Department's Compliance Section verifies the implementation of these safeguards.

Brown claimed that three primary forms of discrimination nonetheless ensured that she was repeatedly passed over in favor of white applicants. First, she claimed that the Department, through the SPD, manipulated the registers of qualified candidates in order to prevent black candidates from being hired. She testified generally at trial that employees' names were known to disappear from and reappear on the registers, and specifically that her name was removed from the CEA register in late 2003, despite her repeated efforts to ensure that her availability remain listed essentially as statewide. Although Brown's name reappeared on the register in 2004, the Department had filled the Assistant Bureau Chief position that she sought during the period when her name had been removed from the list, despite her request to suspend the hiring process and investigate the unexplained disappearance of her name. As Brown reminded the jury in connection with this incident, the Department had been found in Frazer to have "generally avoided compliance with the [Frazer] decrees . . . by examining job

9

registers . . . and . . . requesting certificates of eligibility only at times when no blacks were available for certification," id. at *4, and it remained subject to an injunction specifically prohibiting that practice.

Second, Brown claimed that the Department manipulated seemingly legitimate test scores and employee qualifications by placing favored white employees in "acting" or out-of-classification assignments, giving them new-found experience that boosted their scores and made them appear better qualified when interviewed.[4] Department witness and Chief Engineer Donald Vaughn conceded that the experience gained through an acting position is perhaps the best training an employee can receive, both in terms of test scores (the tests are designed to measure the skills performed on the job) and the appearance of qualification. Moreover, Vaughn himself could not recall any instance in which an employee who had been assigned on an acting basis was not later appointed permanently. Notably, Brown was never given the benefit of any out-of-classification experience or training.

Finally, Brown testified that the Department permitted outright discrimination or retaliation in employment decisions. She claimed that following an interview for one position in late 2003, she was taken aside by a Department

---

[4] This practice was the subject of the Reynolds injunction, which required that acting positions be rotated so that minorities, too, could enjoy their benefits.

10

manager by the name of Camp, who suggested that she would not receive the subject promotion -- or any other promotion -- because (1) the Division Engineer for one of the divisions to which she was applying "did not want [her] there," (2) the other divisions had been instructed to "get the minorities . . . off of th[e] register," and (3), her participation in <u>Reynolds</u> had caused her to be "labeled as a troublemaker." The Department called no witnesses to undermine this testimony.

Brown also testified that she was discouraged, to the extent of being harassed, from accepting a promotion to the position of Pavement Management Engineer, a CEA position that she was offered in early 2004 in the Materials and Tests Bureau, and that even after she accepted the position, further harassment caused her to rescind her acceptance. The record showed that the position in question had been kept open for nearly two years after the vacancy had been created, during which time it was held by Scott George on an acting, out-of-classification basis. When the vacancy was to be filled on a permanent basis, Brown's name appeared on the Certificate, almost certainly above that of George. Brown testified that under the <u>Frazer</u> rule, she would have to decline the position before the Department could offer it to a lower-ranked white candidate.[5]

---

[5] The injunction in <u>Frazer I</u> dictated that "Negro applicants . . . be appointed to positions other than custodial, domestic, laborer or laboratory aide, when said Negro applicants are listed on a Certification of Eligibles, unless higher-ranking white applicants on the certificate are appointed to fill the vacancy (or all the vacancies) in the listed position, or unless the defendants determine that the Negro applicant is not qualified to perform the duties of the position, or is

11

Brown was offered the job, but she then received a phone call on February 12, 2004, from Bureau Chief Larry Lockett, who, in Brown's words, set about "trying to discourage me." Lockett reminded Brown that she "would not have any training, . . . would be on [her] own," and "from day one when [she] walked in that office, [would be] expected to know everything that . . . was needed for that position." Lockett further said "that he had a preference for [Scott George,] who[m] he wanted to fill that position," that "he was considered a mean supervisor," and that Brown "would be starting [her] career all over when [she] should be ending it." Brown initially was not discouraged, and she accepted the position on February 27, 2004. Nonetheless, because of the claimed intimidation, the potential for hostility on the job, and Lockett's expressed preference for George, Brown rescinded her acceptance just two weeks later. At that point, Lockett was free to hire another candidate off of the Certificate, and Scott George ultimately was appointed to the Pavement Management Engineer position.

Brown also presented general evidence indicating that racial bias influenced the Department's hiring processes during the relevant period. Thus, for example, there was testimony suggesting that the Department was hostile towards African-Americans who sought to advance their careers under the protection of the

---

otherwise not fit for the position." 317 F. Supp. at 1091. The district court in Frazer II in turn ordered that, with several exceptions not relevant here, "all provisions of the decree entered in [Frazer I] on July 28, 1970 . . . [would] remain in full force and effect." 1976 WL 729, at *6.

Reynolds consent decree. Around the time a new Transportation Director, Joe McInnes, was appointed in 2003, African-American Executive Assistant Transportation Director Ron Green was effectively replaced by a newly hired white employee, Dan Morris, who had no history at the Department. Also around that time, at least three of the other six African-American Bureau Chiefs were removed from their positions, including Curtis Pierce from the Professional Engineering Education and Development Bureau, Alvena Williams from the Internal Audits Bureau, and Brown's co-plaintiff Roslyn Cook-Deyampert from the Training Bureau. The evidence established that the net result was a significant reduction in the number of black employees in the Department's upper ranks, and that those who still held upper-level positions -- such as Green and Jeffrey Brown -- had considerably reduced duties and staff.

Brown claimed that some combination of the forms of discrimination she outlined led to her being denied nine different promotions on the basis of her race. The promotions -- all of them going to white employees -- were as follows:

-- L. Dee Rowe's promotion as Division Engineer for the Fifth Division on March 25, 2000;

-- Randall Estes' promotion as Division Engineer for the Sixth Division on May 31, 2003;

-- Robin Rhoden's promotion as Assistant Division Engineer for the Fifth Division on December 13, 2003;

13

-- Willis Reynolds' promotion as Assistant Division Engineer for the Fifth Division on December 13, 2003;

-- Charles Tolbert's promotion as County Transportation Engineer for the Ninth Division on December 27, 2003;

-- Mike Mahaffey's promotion as Assistant Division Engineer for the Third Division on March 20, 2004;

-- Stacy Glass's promotion as Assistant Bureau Chief in the Maintenance Bureau on March 20, 2004;

-- Ronnie Baldwin's promotion as Bureau Chief for the Bureau of Office Engineer on March 19, 2005; and

-- Brian Davis's promotion as Division Engineer for the Third Division on September 17, 2005.

At the close of all of the evidence, the Department moved for judgment as a matter of law. The district court summarily denied the motion, and the jury was asked to answer the following questions:

1. "Do you find that the Defendants probably denied promotion(s) to the Plaintiff Geneva Brown because of her race?"

2. "Do you find that the Defendants probably retaliated against Plaintiff Geneva Brown because of her engagement in protected activities?"

3. "What compensatory damages is Plaintiff Geneva Brown entitled to?"

Verdict Form, at 1-2. The jury answered the first two general questions in the affirmative, and determined that Brown was entitled to $65,697.65 in backpay and $25,000.00 for mental anguish. For backpay, the jury adopted the figure provided

14

in Brown's backpay table, which represented the period from May 30, 2001, to September 13, 2006.

The Department renewed its motion for judgment as a matter of law and moved to vacate or remit the backpay award. The district court denied the motions without opinion. It entered a permanent injunction effectuating the jury's backpay award and ordering that Brown be given a "comparable position" pending her permanent promotion to the position of Division Engineer for the Third Division. The Department in turn moved for relief from the judgment, arguing that the district court's injunction did not adequately explain the meaning of the interim "comparable position" that Brown was to receive, granted relief not authorized pursuant to Title VII, and required the Department to violate Alabama law by promoting Brown to a position for which she was supposedly unqualified as a matter of law. The district court denied this motion, too, and the Department presented this timely appeal.

## II.

The Department first contends that the evidence did not support a finding of discrimination or retaliation as to any of the nine promotions that Brown claims to have been denied, and that the backpay award was therefore unsupported. More particularly, the Department claims that the district court erred in denying its motion for judgment as a matter of law with respect to the verdicts and for vacation

15

or remittitur of the backpay award.

We review de novo the denial of a motion for judgment as a matter of law, Combs v. Plantation Patterns, 106 F.3d 1519, 1526 (11th Cir. 1997), applying the same standard as the district court, Telecom. Technical Servs., Inc. v. Rolm Co., 388 F.3d 820, 830 (11th Cir. 2004). Under Federal Rule of Civil Procedure 50, judgment as a matter of law is appropriate only if "the facts and inferences point [so] overwhelmingly in favor of one party . . . that reasonable people could not arrive at a contrary verdict." Combs, 106 F.3d at 1526 (citation omitted). In making that determination, we review all of the evidence in the record, but we must "draw all reasonable inferences in favor of the nonmoving party, and . . . may not make credibility determinations or weigh the evidence." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000). Those are the jury's functions. Id. at 150-51. Thus, we "give credence to . . . evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses." Id. at 151 (citations and quotation marks omitted).

We review for a "clear abuse of discretion" the district court's denial of a motion for remittitur. Griffin v. City of Opa-Locka, 261 F.3d 1295, 1315 (11th Cir. 2001). "A district court abuses its discretion if it applies an incorrect legal standard, applies the law in an unreasonable or incorrect manner, follows improper

16

procedures in making a determination, or makes findings of fact that are clearly erroneous." Citizens for Police Accountability Political Comm. v. Browning, 572 F.3d 1213, 1216-17 (11th Cir. 2009).

A.

Brown claimed that the Department's denial of the nine identified promotions was discriminatory and violated Title VII, which makes it unlawful for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race." 42 U.S.C. § 2000e-2(a)(1).[6] A plaintiff bears the burden of establishing a prima facie case of discrimination in Title VII cases that are supported by circumstantial evidence. Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1087 (11th Cir. 2004). In the failure-to-promote context, the prima facie case consists of showing these elements: (1) that the plaintiff belongs to a protected class; (2) that she applied for and was qualified for a promotion; (3) that she was

_____

[6] Brown also brought claims under 42 U.S.C. §§ 1981 & 1983. The analysis under those claims mirrors that under Title VII. Brown v. Am. Honda Motor Co., 939 F.2d 946, 949 (11th Cir. 1991) ("[T]he test for intentional discrimination in suits under § 1981 is the same as the formulation used in Title VII discriminatory treatment causes." (citing Patterson v. McLean Credit Union, 491 U.S. 164, 185-87 (1989)); Crawford v. Carroll, 529 F.3d 961, 970 (11th Cir. 2008) ("[T]he analysis of disparate treatment claims under § 1983 is identical to the analysis under Title VII where the facts on which the claims rely are the same."). While the Department complains that the district court should have dismissed it from the § 1981 and § 1983 claims on the ground of sovereign immunity, and that backpay was unavailable "against" Rowe and McInnes in their official capacities, the Department does not dispute its amenability to suit under Title VII, nor argue that any unauthorized relief actually was awarded "against" Rowe and McInnes. Accordingly, we decline to address these arguments of the Department.

17

rejected despite her qualifications; and (4) that other equally or less-qualified employees outside her class were promoted. Id. at 1089. The comparators for the fourth prong must be "similarly situated in all relevant respects." Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir. 1997).

If a plaintiff makes the requisite showing, the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions. See Rojas v. Florida, 285 F.3d 1339, 1342 (11th Cir. 2002) (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973)). The employer "need not persuade the court that it was actually motivated by the proffered reasons." Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254 (1981). Rather, if the employer "articulat[es] one or more reasons, then the presumption of discrimination is rebutted, and the burden of production shifts to the plaintiff to offer evidence that the alleged reason of the employer is a pretext for illegal discrimination." Wilson, 376 F.3d at 1087.

The defendant Department of Transportation says that the evidence was insufficient as to each of the promotions that Brown was denied, and that even if it was sufficient as to some, the backpay award still could not be supported because it was an aggregate figure demonstrably reflecting all nine of the promotions. We agree that although the verdict was a general one -- it asked only whether the Department had "denied promotion(s) to . . . Brown because of her race" -- the

18

sufficiency of the evidence as to each individual promotion affects the viability of the aggregate amount of Brown's backpay award. We therefore examine each promotion separately, and, after thorough review of this record, conclude that only three of the nine alleged violations were supported by substantial evidence. We begin with them.

1. Mahaffey

Brown established a prima facie case of discrimination concerning the promotion of Mike Mahaffey, a white male, to the position of Assistant Division Engineer for the Third Division on March 20, 2004. The plaintiff passed the Civil Engineer Administrator test, was placed on the relevant register and on the Certificate of Eligibles as a qualified candidate, but was not promoted once certified for the position. As a non-discriminatory reason for hiring Mahaffey and not Brown, the Department claimed that Mahaffey was more qualified. The jury, however, was entitled to reject the Department's proffered reason.

In the first place, the jury could have found on this record that the Department's proffered reason was not credible. Brown had extensive experience as a Civil Engineer, having served in that position from 1989 to 1998, and as a Civil Engineer Manager from 1998 through the time the CEA vacancy was filled by the Third Division. While the Department successfully demonstrated at trial that Brown did not have Mahaffey's precise qualifications -- "9 years in

Construction, 9 years in Maintenance, 5 years in Materials and Tests and 1 year in Pre-Construction" -- it did not even attempt to explain why those particular qualifications were superior to Brown's.[7]  Thus, although the Department at this stage was not required to "persuade the [fact finder] that it was actually motivated by the proffered reasons," only to show "a genuine issue of fact as to whether it discriminated against the plaintiff," Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254-55 (1981), the jury could have found that the Department's ill-explained reasons failed to show any such "issue."

Second, there was ample evidence of racial discrimination specific to the Mahaffey promotion, suggesting that the Department's proffered reasons were pretextual.  In late 2003, not long before she interviewed for the position given to Mahaffey, Brown also interviewed for a County Transportation Engineer position in the Ninth Division.  She testified that immediately after the interview, she was approached by a manager by the name of Camp.  Camp asked if he was speaking with Geneva Brown; after being told that he was, he asked for a word with her. Brown testified that Camp took her into his office and, for her own good, explained why she likely would not receive any promotions.  Notably, the Division Engineer for the Third Division, James Horsley, had instructed the Eighth Division

_____

[7] In addition to Brown's extensive experience in civil engineering, her test score was one one-hundredth of a point below that of Mahaffey, and she had consistently received excellent performance reviews.

20

engineer "to get the minorities . . . off of that register so that the Third Division, the Ninth Division and all the other divisions . . . could fill their positions with who[m] they wanted." And, the Ninth Division did not want her "because of [her] participation in the lawsuit, the <u>Reynolds</u> case."[8] Horsley, who apparently had held the Third Division Engineer position open for a year or more while Mahaffey gained experience and training on an out-of-classification basis, was on the three-person interview team that selected Mahaffey over Brown, giving the jury substantial reason to reject the Department's proffered explanation.

2. Glass

Stacey Glass, a white male, and not the plaintiff Brown, was promoted to the position of Assistant Bureau Chief of the Maintenance Bureau on March 20, 2004. The Department challenges Brown's claim of discrimination as to this promotion on the ground that her absence from the relevant Certificate of Eligibles prevents her from establishing a <u>prima facie</u> case and provides a non-discriminatory reason

---

[8] In its reply brief, the Department argues that the district court committed reversible error when it overruled the Department's hearsay objection to this testimony. Reply Br., at 23 n.11. Yet, while the Department preserved this argument by objecting at trial, it failed to include it in its opening brief on appeal, thereby abandoning it. See Davis v. Coca-Cola Bottling Co. Consol., 516 F.3d 955, 972-73 (11th Cir. 2008) ("It is well settled in this circuit that an argument not included in the appellant's opening brief is deemed abandoned. And presenting the argument in the appellant's reply does not somehow resurrect it." (internal citations omitted)). In any event, the district court overruled the objection because the relevant statements apparently were made by the Department's agents concerning matters within the scope of their employment, during the existence of an employment relationship. See Fed. R. Evid. 801(d)(2)(D). And, we would review such determinations for a clear abuse of discretion, United States v. Veltmann, 6 F.3d 1483, 1491 (11th Cir. 1993); the Department has failed to show any.

21

for hiring Glass. Brown argued at trial, however, that the Department manipulated the registers to avoid promoting her. We think that the evidence before the jury adequately supported this claim.

While an employee must meet the employer's objective promotion criteria, Vessels v. Atlanta Indep. Sch. Sys., 408 F.3d 763, 769 (11th Cir. 2005), such as scoring high enough to appear on a Certificate of Eligibles, Brown demonstrated that her test score was high enough to have placed her on the Certificate for the Assistant Bureau Chief position. The Department requested the Certificate on January 8, 2004, and received it on January 15. Yet, while the Certificate did contain ten names drawn from the correct register, neither Brown's name nor that of any other black candidate appeared on it. The overwhelming inference, Brown suggested, was that the Department had manipulated the registers.

The Department countered that Brown's name did not appear on the January 15 Certificate because she had limited her availability to Tuscaloosa and Jefferson Counties. The evidence, however, showed that the register reflected Brown's near-statewide availability through mid-November 2003, and that Brown had taken many steps during this period to ensure that her availability remained listed as statewide, with the exception only of Clarke County. Specifically, after her discussion with Mr. Camp in November 2003, Brown wrote to the State Personnel Department on November 6, 2003, asking it to "ensure that [her] name remain[ed]

22

on the Civil Engineering Administrator Register and [to] provide [her] with written confirmation of this." She received confirmation on November 19, 2003, that her "name w[ould] remain active on this list of eligibles to be considered for future vacancies." Still concerned, however, Brown wrote again on November 30 and still again on December 11, noting specifically in the second communication that she was "unavailable for appointment in Clarke County only at this time but [was] available in all other Divisions now." Brown copied management-level Department officials, such as the Eighth Division Engineer, on her December 11 request that she be listed as available everywhere but in Clarke County. On January 30, 2004 -- after the Department had received the Certificate, but well before it made any hiring decisions -- Brown sent yet another communication, albeit to the Certification Section of the State Personnel Department, asking that her "name remain on the register for all counties except Clarke."

The Department contends that this exchange is immaterial because it lacks the ability to influence register listings maintained by the Personnel Department and may only hire from the Certificate that the Personnel Department provides. These contentions do not carry the day for two reasons. First, despite the Department's disclaimer of any influence over the registers, other testimony revealed that the Department, not SPD, furnished the information used to justify removal of an employee from the registers. It was therefore reasonable for the jury

23

to infer that the Department was responsible for the unexplained disappearance of Brown's name from the list, less than two months before the Department obtained a Certificate that contained no black candidates. Indeed, as the jury heard, the Department was prohibited by the Frazer injunction from intentionally requesting Certificates at times when no black candidates appeared on them, as it was found to have done. Second, Brown had notified the Department of her improper removal from the CEA register and requested an investigation well before the Department filled the subject vacancy. Yet despite notice of Brown's situation, the Department filled the position from the original Certificate. From this evidence, the jury was free to infer -- as it undoubtedly did -- that the Department manipulated the hiring system, either by affirmatively seeking Brown's removal from the CEA register, or by waiting to request a Certificate until, for whatever reason, no black candidates appeared on it.

3. Davis

The plaintiff Brown also claimed that she was improperly denied a promotion to the position of Division Engineer for the Third Division, which was filled on an out-of-classification basis by a white engineer, Brian Davis, in August 2005, and then permanently by Davis on September 17, 2005. As with the promotion of Glass, the Department claims that Brown's absence from the relevant Certificate of Eligibles prevents her from establishing a prima facie case and,

24

alternatively, provides the Department with a legitimate, non-discriminatory reason for hiring Davis. But the Davis promotion differs from the Glass promotion in one important respect. Here, Brown did not and could not claim that she should have appeared on the Certificate of Eligibles, since it was drawn from a register on which Brown's name did not appear at all. We, therefore, must first decide whether Brown could have established that she was "qualified" for the subject position despite her absence from both the Certificate and the register from which it was drawn.

While an employee must satisfy the employer's objective promotion criteria, that requirement extends only to criteria that are "valid." See, e.g., Miller v. Ill. Dep't of Corr., 107 F.3d 483, 485 (7th Cir. 1997) (noting, in ADA context, that criteria defining "qualification" must be valid). The Department traditionally used the CESA register to fill Division Engineer positions, but with the Davis promotion, it used a new register known as the Professional Civil Engineer III ("PCE III"). Brown essentially claims that the PCE III register was not a "valid" qualification, and we agree that the jury at least could have reasonably so found.

At trial, but notably not before, the Department purported to justify use of the PCE III register on the basis of a state licensing law that required certain applicants to have an engineer's license. No witness testified that the requirement of an engineer's license -- apparently the sole justification for the PCE III register -

25

- had previously applied to long-standing Department employees, and the only testimony on the subject was that the law "didn't require" an engineer's license prior to 2005. Although Chief Engineer Donald Vaughn stated that this was because "the [Reynolds] Court asked [the Department] to delay the implementation of the requirement to have a license until, I believe, it was June of 2005," he offered no explanation for the existence of the purported requirement, and the jury, faced with considerable evidence of discrimination, was entitled to disbelieve him.

The Department counters that even disregarding the PCE III register and using Brown's preferred measure of qualification -- the CESA register -- Brown still failed to establish a prima facie case. Specifically, although Brown scored twenty-one ranks above Davis on the CESA register, there were over sixty applicants above Brown on that list, making it extremely unlikely that she would have appeared on a Certificate drawn from that register. The jury was free, however, to look past any plausibly invalid promotional criteria, such as the PCE III register, and to ask whether Brown was as qualified as Davis, whom the Department apparently did consider "qualified" insofar as it hired him. In evaluating whether Brown was as qualified as Davis, the best indicator was the register for the Civil Engineer Senior Administrator, from which the Division Engineer position had previously been filled. Since Brown appeared well above Davis on that register, the jury properly could have found her qualified.

26

The Department nonetheless insists that there is no taint of discrimination here, and that it did not hire Brown because she lacked an engineer's license. Donald Vaughn testified that, whatever the official status of the license requirement, the Department nonetheless ensured that "[a]ll of [its] division engineers had a license." Once again, we think the jury was free to reject this explanation. As an initial matter, the jury could have found that the use of this unspoken "objective criterion" was unacceptable and itself discriminatory. Objective "[e]mployment tests can be an important part of a neutral selection system that safeguards against the very racial animosities Title VII was intended to prevent." Ricci v. DeStefano, 129 S.Ct. 2658, 2676 (2009). In other words, such tests may help fulfill "[t]he purpose of Title VII[,] [which] 'is to promote hiring on the basis of job qualifications, rather than on the basis of race or color.'" Id. at 2675 (quoting Griggs v. Duke Power Co., 401 U.S. 424, 434 (1971)).

But tests also "create legitimate expectations on the part of those who took [them]. As is the case with any promotion exam, some [such individuals will have] invested substantial time, money, and personal commitment in preparing for the tests." Id. at 2676. Thus, while an employer may use testing "to ensure that all groups have a fair opportunity to apply for promotions and to participate in the process by which promotions will be made," the employer may not, "once that process has been established" and the selection criteria made known, "invalidate

27

the test results," id. at 2677, by uniformly applying an unofficial and unstated selection criterion. The CESA examination was established after rigorous analysis as the qualification for Division Engineers, and the agency announcement for that position was silent about any licensing requirement. Under the circumstances, the jury could have rejected the Department's attempt to justify hiring Davis rather than Brown on the basis of a uniformly applied but unofficial licensing requirement.

In any event, given the surrounding evidence of discrimination in the Third Division and the Department's questionable use of a new register to impose a new-found licensing requirement in 2005 that supposedly had been enacted in 1997, the jury was by no means required to credit Vaughn's testimony, even though it was unrebutted on the particular point. The immediate context of the promotion, which suggested a substantial measure of pretext, supported the jury's verdict as to this promotion as well.

4. Rowe

The appointment of L. Dee Rowe as Division Engineer for the Fifth Division brings us to the first of six promotions for which we cannot discern sufficient evidence of discrimination to support the jury's verdict. The Department does not dispute that Brown established a prima facie case of discrimination with respect to Rowe's promotion on March 25, 2000; Brown clearly did. The sole question is

28

whether the Department provided a legitimate, non-discriminatory reason for hiring Rowe. The evidence showed that Rowe was appointed through a "backlog process" pursuant to Reynolds. As Brown's co-plaintiff Cook-Deyampert acknowledged, backlog appointments required that "everybody, plaintiffs, intervenors, and the State[,] had to all agree" to the appointment. In fact, the very attorneys representing Brown in this case agreed to Rowe's appointment. Plainly, the use of the backlog process was a non-discriminatory explanation for the promotion of Rowe. Brown failed to carry her burden of demonstrating pretext; she presented no further evidence specific to this promotion.

### 5. Estes

Randall Estes was appointed as Division Engineer for the Sixth Division on May 31, 2003. The Department argues that Brown failed to establish a prima facie case with respect to Estes because he was not "promoted" but merely given a lateral transfer, and because Brown was neither objectively qualified nor "as or more qualified" than Estes. As a preliminary matter, it is doubtful whether Brown, who did not have CESA status at the time, could have been objectively qualified for this CESA-level position.[9] More importantly, however, there was undisputed evidence that Estes was not promoted.

---

[9] At the time in question, lateral transfers did not require a Certificate of Eligibles. When Certificates were used to fill Division Engineer positions, however, they were generated from the CESA register.

In a failure-to-promote case, the plaintiff must show "that other employees of similar qualifications who were not members of the protected group <u>were indeed promoted</u> at the time the plaintiff's request for promotion was denied." <u>Chappell-Johnson v. Powell</u>, 440 F.3d 484, 488 (D.C. Cir. 2006) (emphasis added) (citation omitted). But Estes was moved from one Division Engineer position to another, retained the same job classification, and received no pay increase. There was no promotion. While Brown's attorneys suggested that Estes' transfer nonetheless was invalid in that it amounted to a mere reshuffling of white employees who had benefitted from past discrimination, there was no evidence that Brown even was seeking the particular position that Estes received, or that the transfer of Estes from one division to another reduced Brown's chances of receiving a promotion. The evidence therefore did not support a claim of discrimination with respect to the promotion of Estes.

<u>6. Reynolds</u>

Willis G. Reynolds was promoted to the position of Division Engineer for the Fifth Division on December 13, 2003. The Department argues that Brown failed to establish a <u>prima facie</u> case or, alternatively, to rebut the Department's evidence of a legitimate, non-discriminatory motive with respect to the promotion of Reynolds. We agree that Brown failed to establish a <u>prima facie</u> case. She did not appear on the Certificate of Eligibles used to fill the position, as explained by

30

the fact that her score on the Civil Engineer Senior Administrator examination was 41.65, while the lowest score on the eleven-applicant Certificate from which Reynolds was selected was 41.80. Brown was required to satisfy the Department's objective criteria, Vessels, 408 F.3d at 769, and there was no evidence that the use of this particular Certificate was invalid or otherwise improper. Brown thus failed to show that she was qualified for the promotion given to Reynolds.

In any event, the Department proffered legitimate, non-discriminatory reasons for hiring Reynolds: he appeared at the top of the Certificate, with a score of 51.19; and, the Assistant Transportation Director Ronald Green, who is African-American, stated in writing that Reynolds was being selected over other candidates, including "someone with veteran points," because he was "better suited for the[] position[]." Brown failed to show any pretext. She suggested that the Reynolds promotion was tainted by the improper use of "acting" placements, but the record did not support this suggestion. While the position filled by Reynolds previously had been occupied by an employee acting out of classification, there was no evidence that Reynolds had received any such favorable treatment.

7. Rhoden

Robin Rhoden was promoted from the same Certificate used to promote Reynolds, and the facts surrounding the two promotions are virtually identical, except insofar as Rhoden was listed third, not first, on the Certificate. Brown was

31

not and could not have been on the Certificate, and therefore failed to establish a prima facie case. And, once again, Brown's absence from the Certificate also provided a legitimate, non-discriminatory reason for the promotion of Rhoden. Further, Rhoden had a number of specific qualifications listed on a form memorializing her promotion, including experience in construction and as a District Engineer, a working knowledge of materials issues, and a degree in civil engineering technology. Brown, who had largely completed the requirements for a degree in civil engineering, had never obtained one. In addition, Rhoden's appointment was approved expressly by Brown's African-American supervisor Ron Green. Green, as a member of the interview team, found Rhoden "better suited" than the other applicants. Finally, as with Reynolds, there is no evidence that the Department provided Rhoden with an unfair competitive advantage through out-of-classification assignments to the position she ultimately filled.

8. Tolbert

Charles Tolbert was promoted to the position of County Transportation Engineer for the Ninth Division on December 27, 2003. This promotion poses a peculiar question, namely, whether Brown sufficiently informed the jury of her claim relative to this promotion, such that a reviewing court could assume that the jury even considered any supportive evidence. The sole testimony offered to the jury on the subject of Tolbert's promotion was Brown's concessions on cross-

32

examination that she: "didn't testify [on the subject of] that [promotion]" and "did not provide [evidence regarding] that [promotion] to the jury" at trial; did not know whether she was on the Certificate of Eligibles for the position; did not interview for the position; and did not know whether Tolbert or someone else got the promotion. Brown herself drew no connection between the discussion with Mr. Camp and the Tolbert promotion. In all, the jury heard nothing on the subject of the Tolbert promotion from any witness. We cannot fairly ascribe the jury's findings of discrimination to the Tolbert promotion, when the jury had no reason to know that the promotion was even at issue.

### 9. Baldwin

The facts before the jury on the subject of Ronald Baldwin's promotion to the CESA position of Bureau Chief for the Office Engineer Bureau on March 19, 2005, were few, and they do not support a finding of discrimination. Brown was not on the Certificate used to fill the position given to Baldwin, offered no specific evidence with respect to her efforts to obtain the job or her qualifications relative to Baldwin's, and provided no reason why the Department's reliance on the Certificate was pretextual. Brown did not, for example, claim that the Department used out-of-classification rotations to favor Baldwin over herself, or that she had been removed improperly from the register from which the Certificate was generated. In short, there were no facts supporting a finding in Brown's favor with

33

respect to Baldwin's promotion.

B.

Brown also claimed that she was denied each of the nine promotions as a form of retaliation for her outspoken opposition to discrimination, and specifically for her testimony on at least four occasions between 1992 and 2004 in the Reynolds litigation. We need not address whether the evidence supported a claim of retaliation with respect to the promotions of Mahaffey, Glass, or Estes, having already concluded that there was sufficient evidence to support a jury finding of discrimination in the failure to promote the plaintiff. And the remedy for the retaliatory claims would be exactly the same. We do, however, examine the sufficiency of the evidence concerning the plaintiff's claims of retaliation as to the remaining six promotions -- those of Rowe, Estes, Reynolds, Rhoden, Tolbert, and Baldwin. These retaliatory claims fail for insufficient evidence.

The McDonnell Douglas burden-shifting analysis applies in cases of retaliation relying on circumstantial evidence, such as this one. Bryant v. Jones, 575 F.3d 1281, 1307 (11th Cir. 2009). As we recently explained, the prima facie case for retaliation requires the employee to show that:

> (1) he engaged in a statutorily protected activity; (2) he suffered an adverse employment action; and (3) he established a causal link between the protected activity and the adverse action. These three elements create a presumption that the adverse action was the product of an intent to retaliate. Once a plaintiff establishes a prima facie case

34

of retaliation, the burden of production shifts to the defendant to rebut the presumption by articulating a legitimate, non-discriminatory reason for the adverse employment action. If the defendant carries this burden of production, the presumption raised by the prima facie case is rebutted and drops from the case. After the defendant makes this showing, the plaintiff has a full and fair opportunity to demonstrate that the defendant's proffered reason was merely a pretext to mask discriminatory actions.

Id. at 1307-08 (internal citations and quotation marks omitted).

There is no dispute here that Brown engaged in protected activity -- her testimony and general involvement in the Reynolds discrimination class action against the Department, see 42 U.S.C. § 2000e-3(a); Crawford v. Carroll, 529 F.3d 961, 970 (11th Cir. 2008) -- and that she suffered a series of adverse employment actions. The disputed question is whether the evidence sufficiently established, with respect to any of the promotions that Brown allegedly was denied, a "causal connection" between the two foregoing facts. To show causation, a plaintiff in a retaliation case need prove only that retaliatory animus was one factor in the adverse employment decision. See, e.g., Terry v. Ashcroft, 336 F.3d 128, 140-41 (2d Cir. 2003).

The Department noted that the only specific times Brown claims to have testified in Reynolds were in 1992, and again in December 2004, and that the closest promotion in time to those dates (that of Baldwin on March 19, 2005) was three months removed. It also claims that no decisionmakers at the Department

35

were shown to have had knowledge of Brown's participation or testimony in Reynolds, as required by our case law. See Gupta v. Fla. Bd. of Regents, 212 F.3d 571, 590 (11th Cir. 2000) (requiring plaintiff to show that decisionmaker knew of her participation in a protected activity).

The Department takes too narrow a view of Brown's involvement in the Reynolds lawsuit, and of the evidence of retaliatory animus presented at trial. The specific dates or periods when Brown recalls testifying are not the only dates relevant here. In addition to testifying in 1992 and again in 2004, Brown also testified on at least two occasions between 1992 and 2004, although she did not recall when, specifically. Brown's undisputed testimony also was that she was an "active" member of the Reynolds class, and that when she was not testifying, she "was . . . on the witness list to testify, [and was a] very vocal . . . participant." As Brown argues on appeal, the potential significance of the protected activity must be taken into account in assessing how strictly the rule of temporal proximity should be applied. A single statement that injures or offends the employer is different from vocal participation in a "contentious, on-going class action that makes major inroads in upsetting systemic racial discrimination," Answering Br., at 38, which is an apt characterization of the Reynolds litigation.

That said, we agree with the Department that this is not a case where temporal proximity alone is sufficient to establish an inference of retaliation. To

36

do so, the temporal relationship between the protected activity and the adverse employment action must be "very close." Thomas v. Cooper Lighting, Inc., 506 F.3d 1361, 1364 (11th Cir. 2008) (quoting Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 273 (2001)). Even a three-month interval between the protected expression and the employment action -- the briefest interval we face here -- is too long. Id. (citing Richmond v. ONEOK, 120 F.3d 205, 209 (10th Cir. 1997)). "Thus, in the absence of other evidence tending to show causation, if there is a substantial delay between the protected expression and the adverse action, the complaint of retaliation fails as a matter of law." Id.

Here, Brown offered no additional evidence of retaliation except for her testimony concerning the interaction with Mr. Camp. This evidence, at least with respect to retaliation, was wholly generalized and plainly insufficient to establish liability without something more. But because Brown did not offer anything more as to the promotions or transfers of Rowe, Estes, Reynolds, Rhoden, Tolbert, and Baldwin -- indeed, she offered nothing at all on the subject of the Tolbert promotion -- she failed to establish a claim of retaliation concerning those promotions.

On balance, there are only three promotions -- those of Mahaffey, Glass, and Davis -- that yield an inference of either discrimination or retaliation. As a result, backpay was permissible only as for those three promotions.

37

C.

The jury awarded backpay to Brown in the amount of $65,697.65, the precise amount proposed in Brown's backpay table. The table reflected a backpay period running from May 30, 2001, to September 13, 2006, and spanning all nine promotions, and was generally calibrated to account for the pay increases that Brown would have received from the first date she was denied a promotion to a particular salary level. For a number of reasons, the Department argues that the backpay award should have been vacated or remitted.

A district court may order a remittitur to reduce an excessive verdict under several circumstances, including "where the court can identify an error that caused the jury to include in the verdict a quantifiable amount that should be stricken." Kirsch v. Fleet Street, Ltd., 148 F.3d 149, 165 (2d Cir. 1998) (citation omitted); see also United States ex rel. A+ Homecare, Inc. v. Medshares Mgmt. Group, Inc., 400 F.3d 428, 458 (6th Cir. 2005) (citation omitted).

The Department first argues that Brown failed at trial to disclose the basis for her backpay table -- in particular, the specific comparators she used in her table to establish the level of pay she should have received. We are unpersuaded. Brown disclosed the bases for the table to defense counsel prior to trial, and counsel fully cross-examined the preparer of the table without suggesting that the table was inaccurate in any way. Under these circumstances, the jury was free to

38

accept the table at face value.

The Department next argues that Brown's backpay should have been cut off by her rejection of several offers of promotion in late 2003 and early 2004. This is a mitigation argument on which the Department bears the burden of proof. Nord v. U.S. Steel Corp., 758 F.2d 1462, 1470-71 (11th Cir. 1985); Marks v. Prattco, Inc., 633 F.2d 1122, 1125 (5th Cir. 1981).[10] The Department is correct that "absent special circumstances, the rejection of an employer's unconditional job offer ends the accrual of potential backpay liability." Ford Motor Co. v. EEOC, 458 U.S. 219, 241 (1982). But "special circumstances" include situations in which the employer's offer is not made in "good faith," or where the employee's rejection of the offer is "reasonable." Stanfield v. Answering Serv., Inc., 867 F.2d 1290, 1296 (11th Cir. 1989).

The Department cross-examined Brown on the only two identified instances in which she declined a promotion. Brown first testified in detail about the campaign of harassment directed at her by her would-be supervisor as she considered whether to accept one such offer -- a position in the Materials Bureau ultimately given to Scott George. She then testified that she declined a position in

---

[10] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), we adopted as binding precedent the decisions of the former Fifth Circuit rendered before the close of business on September 30, 1981.

39

the Eighth Division because of a racially hostile work environment. Specifically, Brown testified that her former co-worker Freddie Golthy, an African-American who participated with Brown in the Reynolds litigation, was murdered on the Eighth Division premises by a white employee, that the homicide was racially motivated, and that the area was known for its prevalent racism. The jury was entitled to credit Brown's account of her decisions to reject the offers of promotion over the Department's account.

The Department's third claim is that Brown's backpay award must be reduced because she failed to prove that any discriminatory or retaliatory denial of a promotion occurred before May 30, 2001, the beginning of the backpay period. We agree with this argument. Brown failed to present sufficient evidence to support her claims with respect to the promotions (or transfers) of Rowe, Estes, Reynolds, Rhoden, Tolbert, and Baldwin. Because she made a series of "separate claim[s] of discrimination on the part of [the Department] for which [she] cannot recover absent proof that the promotions were denied on the basis of race," Robinson v. City of Fairfield, 750 F.2d 1507, 1512 (11th Cir. 1985), the backpay award must be recalculated. Accordingly, we vacate the award and remand with instructions that the district court determine an amount of backpay that will, to the extent reasonably possible and consistent with this opinion, make Brown "whole for injuries [she] suffered on account of [the Department's] unlawful employment

discrimination." Albemarle Paper Co. v. Moody, 422 U.S. 405, 418 (1975).

Although the Seventh Amendment ordinarily requires that an order of remittitur be accompanied by an offer for a new trial, there is no such need under the peculiar circumstances of this case. Backpay in this Circuit is considered equitable relief, whether granted under Title VII, which provides solely for equitable remedies, or §§ 1981 and 1983, which provide for legal remedies as well. Whiting v. Jackson State Univ., 616 F.2d 116, 122 n.3 (5th Cir. 1980); see also Johnson v. Chapel Hill Indep. Sch. Dist., 853 F.2d 375, 383 (5th Cir. 1988). The determination of backpay under any of these provisions therefore "entails no rights under the seventh amendment." Lincoln v. Bd. of Regents of Univ. Sys. of Ga., 697 F.2d 928, 934 (11th Cir. 1983).

Of course, when legal and equitable issues are tried together and overlap factually, the Seventh Amendment requires that "all findings necessarily made by the jury in awarding [a] verdict to [a party on legal claims] are binding on . . . the trial court" when it sits in equity. Williams v. City of Valdosta, 689 F.2d 964, 976 (11th Cir. 1982).[11] Here, there was an evident factual overlap between Brown's legal claim for mental anguish damages and her equitable claim for backpay. Critically, however, the jury did not "necessarily" make any findings with respect

---

[11] When legal and equitable issues are tried together and do not overlap, the jury's verdict on any equitable issues is advisory. Sherman v. Burke Contracting, Inc., 891 F.2d 1527, 1529 n.4 (11th Cir. 1990).

41

to the availability of any legal relief.  The jury found only that the Department denied promotions to Brown on the basis of her race or for retaliatory reasons, and it awarded her mental anguish damages on the basis of one or more unspecified instances of discrimination or retaliation.  Thus, there were no findings as to any legal claim that would merit deference in scrutinizing the facts underlying the purely equitable backpay award.

## III.

Based on the jury's findings, the district court entered a permanent injunction, the relevant portions of which required the Department to (1) "immediately transfer Plaintiff Geneva Brown in a comparable position nearest her residence in the Third or Fifth Division"; (2) "promote her to fill the next vacancy in the position of Division Engineer in the Third Division"; and (3) compensate her "at a rate not less than that of the incumbent Brian Davis."  Final Judgment and Permanent Injunction, at 3.

The Department challenges the injunction on three grounds.  First, it claims that the term "comparable," as used to describe the interim position that Brown shall receive in the Third or Fifth Divisions, is not sufficiently definite.  Second, it says that the district court lacked the authority to order specifically that Brown be instated in the Third Division, near her residence, rather than in the first available position to which she claims to have been denied a promotion, wherever that

42

vacancy may arise. Finally, the Department contends that it is prohibited by Alabama law from placing Brown in a Division Engineer position, inasmuch as Brown does not hold an engineering license purportedly required by state law.

"Although the grant of permanent injunctive relief is generally reviewed for an abuse of discretion, if the trial court misapplies the law we will review and correct the error without deference to that court's determination." Hughey v. JMS Development Corp., 78 F.3d 1523, 1528 (11th Cir. 1996) (quotation marks and citation omitted); see also Guaranty Fin. Servs., Inc. v. Ryan, 928 F.2d 994, 998 (11th Cir. 1991).

Like unclear legislation, a vague injunction "may trap the innocent by not providing fair warning" of what is prohibited. Grayned v. City of Rockford, 408 U.S. 104, 108 (1972). Not surprisingly, Federal Rule of Civil Procedure 65(d) requires that injunctive orders "state [their] terms specifically" and "describe in reasonable detail . . . the act or acts restrained." In other words, to comply with the requirements of Rule 65(d), an injunction must "be specific and definite enough to apprise those within its scope of the conduct that is being proscribed." In re Baldwin-United Corp., 770 F.2d 328, 339 (2d Cir. 1985).

While the district court's injunction unambiguously requires that Brown be placed in the "next vacancy in the position of Division Engineer in the Third Division," it does not define with adequate specificity the "comparable" position

43

that Brown is to hold pending a vacancy in the Third Division Engineer position. The term "comparable" might designate -- as Brown asserts -- positions comparable to those that Brown claims to have been improperly denied. Yet, even ignoring the inherent lack of clarity in that designation (most of the subject promotions were to CESA-level positions, but several -- including one as to which we discern sufficient evidence -- were not), the injunction could also reasonably designate positions "comparable" to Brown's current position at the Civil Engineer Administrator level. The latter interpretation is plausible for two reasons.

First, in ordering Brown's co-plaintiff Roslyn Cook-Deyampert reinstated and promoted to the next vacancy in the Sixth Division Engineer position, the district court provided that Cook-Deyampert's <u>interim</u> position would be either her "<u>former or a comparable position</u>." The court clearly tied the interim position to Cook-Deyampert's <u>last-held</u> position, not the position to which she would be promoted. The only meaningful difference in the clause governing Brown's instatement level is that Brown was never terminated. Plainly, then, the "comparable position" language could refer to Brown's current CEA-level position. Second, while the district court's remedy might have appeared incomplete if Brown and Cook-Deyampert had been left for some indefinite period in positions comparable to their former jobs -- such incompleteness suggesting that the injunction could only be read as Brown reads it -- the district court required

44

that both plaintiffs receive pay at the Division Engineer level pending promotion, meaning that a reading contrary to Brown's would be consistent with both the letter and the spirit of the injunction.

Notably, the injunction also fails to specify what the Department must do if the subject "comparable position" -- however defined -- is not available. Unlike the command that Brown must be given the next vacancy in the Third Division Engineer position, the "comparable position" clause does not disclaim a requirement that the Department "bump" a current occupant, nor state whether the Department is expected to create a vacancy if one is not currently available.

Although Brown understandably complains that the Department "has made no effort . . . to identify a job it proposes as 'comparable' or to otherwise consult with plaintiff to determine if there is a genuine controversy about whether it is 'comparable,'" Answering Br., at 59, the injunction itself still must be clear enough so that the enjoined party can comply without fear of contempt. Cf. N.Y. State Nat'l Org. for Women v. Terry, 886 F.2d 1339, 1351-52 (2d Cir. 1989) ("[Rule 65(d)] was intended to prevent an uncertain or vague decree from becoming the basis for a contempt citation."). And, while the Department did not preserve this issue in the district court by seeking clarification, we may nonetheless address the issue if its "proper resolution is beyond any doubt." Narey v. Dean, 32 F.3d 1521, 1526-27 (11th Cir. 1994) (listing five exclusive exceptions to ban on appellate

45

review of issues not raised in the district court). We think it "beyond any doubt" that the "comparable position" clause fails the standard enunciated by Rule 65(d). We therefore direct the district court to redraft that clause on remand with the clarity and specificity required by the Federal Rules. See PMC, Inc. v. Sherwin-Williams Co., 151 F.3d 610, 619-20 (7th Cir. 1998) (remanding to district court for redrafting of insufficiently definite injunction).

The Department next argues that nothing in Title VII entitles Brown to a position near her residence. It claims that Brown should have been ordered promoted to whatever vacancy became available among the positions to which she claims to have been denied a promotion. Title VII provides broadly that

> [i]f the court finds that the respondent has intentionally engaged in or is intentionally engaging in an unlawful employment practice charged in the complaint, the court may . . . order such affirmative action as may be appropriate, which may include, . . . reinstatement or hiring of employees, with or without back pay . . . , or any other equitable relief as the court deems appropriate.

42 U.S.C.A. § 2000e-5(g)(1) (emphasis added).

Subsequent to the events underlying her legal claims, Brown agreed to work in Montgomery after receiving one of the Civil Engineer Administrator positions she had so long sought to obtain. At the time of trial, she was driving over one hundred miles each way from her residence in Tuscaloosa. At trial, Brown expressed a desire to be instated at a level equivalent to that of the improperly

46

denied promotions, and "to be brought back home." In light of the promotions that the jury properly could have found were denied Brown on account of her race, the district court was authorized to remedy the violations by ordering such "equitable relief as [it] deem[ed] appropriate." 42 U.S.C.A. § 2000e-5(g)(1). On the facts presented here, the district court acted well within its considerable discretion in specifying that Brown be promoted to a position in the Third Division, near her home.

Finally, the Department says that an Alabama state licensing law prevents it from instating Brown at the level of Division Engineer. Alabama law does contain a license requirement for engineers,[12] but also contains the following exemption from that requirement:

> This chapter shall not be construed to prevent or to affect any of the following . . . (5) The practice of engineering or land surveying by any person who is employed by the Alabama Department of Transportation prior to January 1, 1997, in any engineering or engineering assistant classification series under the State of Alabama Personnel Board, Merit System.

Ala. Code § 34-11-14. The Department, armed with a consistent interpretation by the Office of the Alabama Attorney General, contends that the statute exempts those persons employed in one of the relevant classifications prior to January 1,

---

[12] "No person in either public or private capacity shall practice or offer to practice engineering or land surveying, unless he or she shall first have submitted evidence that he or she is qualified so to practice and shall be licensed by the board as hereinafter provided or unless he or she is specifically exempted from licensure under this chapter." Ala. Code. § 34-11-2(a).

1997, from the licensing requirement only to the extent they remain in those same positions -- i.e., that any advancement beyond those classifications requires a license. See State of Alabama, Office of the Attorney General, Opinion Regarding Interpretation of Alabama Code § 34-11-14(5), dated April 12, 2004. The district court was unpersuaded by the opinion letter and the Department's argument, and we see no legal error or abuse of discretion in the district court's determination.

As an initial matter, the district court made a factual finding that Brown was employed in a position prior to 1997 that brought her within the terms of the exemption. Final Judgment and Permanent Injunction, at 3 n.1 (citing Ala. Code § 34-11-14(5)). The Department has not argued, and therefore has not shown, that the district court's finding of fact was clearly erroneous. Carmichael v. Kellogg, Brown & Root Servs., Inc., 572 F.3d 1271, 1279 (11th Cir. 2009) ("We review the district court's . . . factual findings for clear error."); Univ. of Ga. Athletic Ass'n v. Laite, 756 F.2d 1535, 1543 (11th Cir.1985) ("[T]he 'clearly erroneous' standard . . . presents a formidable challenge to appellants who . . . seek to overturn the factual findings of a district court.").

As for whether the district court committed legal error in construing the scope of the exemption, we first note that because the Attorney General had issued an opinion on the point, the district court was not free to "proceed as if the matter were open to utterly independent consideration." Huggins v. Isenbarger, 798 F.2d

48

203, 207 (7th Cir. 1986) (Easterbrook, J., concurring). Such "opinions of the

Attorney General of course are not binding, [but] they are entitled to some

deference, especially where judicial decisions construing a statute are lacking."

Tel-Oren v. Libyan Arab Republic, 726 F.2d 774, 780 n.6 (D.C. Cir. 1984)

(Edwards, J., concurring) (collecting cases addressing deference to opinions of

state and federal attorneys general). In the absence of any dispositive state-court

jurisprudence on an issue of state law, a federal court should "closely examine the

opinions of the [State] Attorney General." Kneeland v. Nat'l Collegiate Athletic

Ass'n, 850 F.2d 224, 228 (5th Cir. 1988).

The opinion at issue here was requested sometime in 2004, in the midst of

this litigation, by Transportation Director Joe McInnes, who asked the Attorney

General whether

> section 34-11-14(5) of the Code of Alabama exempt[s] an employee
> of the Alabama Department of Transportation ("ALDOT"), who was
> employed as an engineer or engineer assistant before January 1, 1997,
> from having to obtain a license or certificate throughout his or her
> employment with ALDOT regardless of his or her position, or
> [whether] it only exempt[s] the employee from having to obtain a
> license for the position he or she held before January 1, 1997[.]

Opinion, at 1. Citing the judicial canon that "grandfather clauses" are to be

construed narrowly, and noting the Legislature's desire to "protect the public from

unqualified, incompetent, and dishonest engineers," id. at 4, the Office of the

Attorney General responded in a formal opinion that the exemption only applies to

49

an exempt employee's current classification. It found further support for this reading in a comparison with an earlier provision, enacted in 1961, which exempted from the licensing requirement "the practice of <u>any person</u> who is employed by the Alabama State Highway Department in the classified service under the State of Alabama Personnel Board (Merit System)." 1961 Ala. Acts No. 79 (emphasis added). The Office of the Attorney General noted that the older provision "did not restrict the application of the exemption by either the employee's position or time of employment," Opinion, at 5, suggesting that the newer provision was generally more restrictive.

We believe the district court properly declined to defer to the opinion of the Attorney General in this instance. Like the district court, we are not persuaded by the defendant's position concerning the exemption. The statute provides an exemption for

> [t]he practice of engineering or land surveying by any person who is employed by the Alabama Department of Transportation prior to January 1, 1997, in any engineering or engineering assistant classification series under the State of Alabama Personnel Board, Merit System.

Ala. Code. § 34-11-14. As we read it, the statute could not be clearer in separating the clause regulating the <u>scope</u> of the exemption from the clause specifying <u>who may enjoy it</u>. The statute states that its licensing requirement shall not affect "[t]he practice of engineering by any person" who falls within a particular class of

50

individuals, namely, those individuals who were "employed by the Alabama Department of Transportation prior to January 1, 1997, in any engineering or engineering assistant classification series under the State of Alabama Personnel Board, Merit System." Notably, the statute does not provide an exemption for "the practice of engineering . . . in any engineering or engineering assistant classification series by any person who is employed in such a classification by the Alabama Department of Transportation prior to January 1, 1997." The reading offered by the Attorney General would require the addition of words that the actual statute does not contain.

The Attorney General nevertheless offers a series of observations on the construction of grandfather clauses and the role of legislative intent in statutory interpretation. But under Alabama law, "[w]here a statutory pronouncement is distinct and unequivocal, there remains no room for judicial construction and the clearly expressed intent of the legislature must be given effect." Ex parte Holladay, 466 So.2d 956, 960 (Ala. 1985). This statute is clear that if an employee worked in one of the listed classifications prior to the first day of 1997, the statute does not affect "[t]he practice of engineering" as to that employee. The district court committed no legal error and did not abuse its discretion in the entry of injunctive relief.

But, even if the statute were in some manner ambiguous, the district court

51

would not have been bound to adopt the interpretation advanced by the Attorney General, only to give that interpretation "some deference." Tel-Oren, 726 F.2d at 780 n.6 (Edwards, J., concurring). That deference ordinarily is considerable where there are no judicial decisions construing the statute. Id. Here, however, we think the district court still would have been free to decline to defer to the opinion of the Attorney General in fashioning injunctive relief.

The Department's interpretation of the statute squarely implicated the district court's ability to vindicate federal non-discrimination policy. The record reflected a long history of racially motivated workplace discrimination. It also indicated, more specifically, that the Department's interpretation of the licensing requirement represented an abrupt break with its past practice of exempting candidates in service prior to 1997. Finally, it showed that the interpretive change caused all but one of the forty-nine black employees previously qualified for Division Engineer and Bureau Chief positions under the CESA register to become ineligible for those positions. Under the peculiar facts and circumstances of this case, we do not believe the district court would have abused its considerable discretion in declining to adopt the reading advanced by the Department, even if the statute had contained an ambiguity.

IV.

In short, substantial evidence supported the jury's findings that the

52

Department discriminated against Geneva Brown in connection with three of the promotions she was denied, but that the evidence was insufficient to support a finding of discrimination or retaliation as to the remaining six promotions. Because the jury's backpay award was plainly a cumulative figure reflecting each of the promotions, we are obliged to remand the backpay award for recalculation. Upon remand, the district court shall make an equitable recalculation of Brown's backpay that reflects, to the extent ascertainable, only the three promotions for which Brown presented sufficient evidence of discrimination or retaliation. On remand, the district court shall also clarify that portion of the permanent injunction requiring that Brown be instated to a "comparable position" pending her promotion to the position of Third Division Engineer. In all other respects, we affirm the entry of injunctive relief.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**