[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 12-13357
Non-Argument Calendar
_____

D.C. Docket No. 8:11-cv-00216-JSM-TGW

JOHN SCHOPPMAN,

                                                     Plaintiff-Appellant,

versus

UNIVERSITY OF SOUTH FLORIDA BOARD OF TRUSTEES,

                                                     Defendant-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida
_____

(May 22, 2013)

Before CARNES, MARCUS, and KRAVITCH, Circuit Judges.

PER CURIAM:

        John Schoppman appeals the grant of summary judgment to the University

of South Florida on his claims of retaliation in violation of Title VII of the Civil

Rights Act of 1964 and Florida law.  Schoppman contends that USF unlawfully retaliated against him by not reappointing him to his position because he was interviewed in connection with two investigations into USF's employment practices.

I.

Schoppman began working for USF in 1987.  In July 2005 he started working in the admissions office of the college of medicine as an academic support services coordinator.  His duties included maintaining the website for medical school applicants, scheduling applicant interviews, advising applicants on the status of their files, and coordinating and conducting tours for prospective students.  In April 2007 Schoppman's job title was changed to admissions recruiter/advisor as part of a University-wide job reclassification, but his duties remained the same.

When Schoppman began working in the admissions office his direct supervisor was Robert Larkin, who was the director of admissions.  In 2007 Dr. Gretchen Koehler was appointed as assistant dean of educational affairs and became Larkin's supervisor.  Shortly after Koehler was appointed to that position, Schoppman told her that Larkin had made an inappropriate joke and gesture directed at Bryant Fayson, an African-American co-worker and friend of Schoppman.  Koehler reported that information to USF's Office of Diversity and Equal Opportunity, which began an investigation.  On March 30, 2007 Schoppman

2

was interviewed by the DEO office's compliance coordinator as part of the investigation. On May 31, 2007 the DEO office issued its final report on the Larkin-Fayson incident to Koehler, which listed the individuals who were interviewed, summarized what they said, and concluded that Larkin did not violate USF's equal opportunity policies.

In July 2007 Larkin resigned from his position at USF. Koehler was appointed as interim director of admissions and become Schoppman's and Fayson's direct supervisor. In October Koehler issued a letter of non-reappointment to Fayson. That caused Fayson to file a complaint against Koehler with USF's DEO office, alleging that his non-reappointment was retaliatory and discriminatory. The DEO office initiated an investigation.

In January 2008, while the investigation into Fayson's non-reappointment was pending, Koehler hired Leila Amiri as the associate director of admissions and she became Schoppman's direct supervisor. On March 25, 2008 the DEO office interviewed Schoppman in connection with the still ongoing Koehler-Fayson investigation, and he stated that he believed that Koehler discriminated against men because of their gender. Two days later, on March 27, Koehler initiated the process of removing Schoppman from his position by beginning to draft a memo to a USF associate vice president recommending that Schoppman not be reappointed. Koehler finalized that memo on April 7, and Schoppman was notified of his non-

3

reappointment on April 16 by a letter stating that his employment would end effective October 16, 2008 and that the decision was based "on the determination that a different approach is needed for the College of Medicine Admissions Office." Koehler received the report from the DEO summarizing Schoppman's statements against her on April 8.

Shortly after Koehler began supervising Schoppman, she began documenting concerns about his performance and about whether he was a good fit in his position as admissions recruiter/advisor. For example, on August 16, 2007 Koehler sent an e-mail to Schoppman asking him to limit his advising of students and to document all of his advising on the standard form. On October 31, 2007 Koehler told Schoppman that he needed to make updating secondary application materials a top priority, but he did not do so. On November 1, 2007 Koehler received information from USF's business office that Schoppman was not submitting invoices to be paid in a timely manner.

After Amiri was hired in January 2008, Koehler sent her an e-mail informing her that she had serious concerns about Schoppman's performance and suggested that the two of them should give him a formal evaluation. Other tasks were more important, however, so they never got around to formally evaluating Schoppman's job performance. Yet the problems continued. On February 4, 2008 the associate dean for student affairs told Koehler that he had received a complaint from an

applicant that Schoppman had been unprofessional in discussing the merits of her application. On February 15 the same associate dean notified Koehler that Schoppman had inappropriately advised a current student on how to circumvent certain curriculum requirements. Koehler informed Amiri, who stated that Schoppman "does not have an academic mindset so I am not certain he should be advising."

Shortly thereafter Koehler and Amiri met with Schoppman to discuss the problems with his job performance. But the problems continued even after that meeting. In late February Amiri confronted Schoppman about his failure to copy her on an e-mail despite her having instructed him to do so. She also e-mailed Schoppman about discrepancies between what he was telling her and what others were reporting. In March Amiri and Koehler documented several other incidents where Schoppman failed to follow their instructions while performing his job. They also documented repeated incidents where Schoppman inappropriately advised current students, even though they had told him in the past that his job did not involve advising current students, and they noted that Schoppman's attitude and performance were unacceptable and making it difficult for the employees in the admissions office to work as a team.

II.

5

After Schoppman's non-reappointment, he filed suit against USF alleging that Koehler unlawfully retaliated against him because of his participation in the Larkin-Fayson and Koehler-Fayson DEO investigations. The district court granted USF's motion for summary judgment, finding that there was no genuine issue of material fact as to whether Schoppman's non-reappointment was caused by his participation in the two DEO investigations and that even if there was sufficient evidence of causation, Schoppman did not present any evidence from which a jury reasonably could conclude that USF's proffered non-retaliatory reasons for his non-reappointment were pretextual. This is Schoppman's appeal.

We review de novo the district court's grant of summary judgment, viewing the evidence and drawing all inferences in the light most favorable to the non-moving party. Hamilton v. Southland Christian Sch., Inc., 680 F.3d 1316, 1318 (11th Cir. 2012). "Summary judgment is appropriate only if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Id. (quotation marks omitted).

## III.

Title VII and the Florida Civil Rights Act prohibit employers from taking an adverse employment action against an employee because he participated in a protected activity. 42 U.S.C. § 2000e-3(a); Fla. Stat. § 760.10(7). The standard for proving liability under Title VII and Florida law is the same, so we evaluate

Schoppman's state and federal claims together.  See Blizzard v. Appliance Direct, Inc., 16 So. 3d 922, 926 (Fla. 5th DCA 2009).

## A.

Schoppman contends that there is direct evidence that Koehler unlawfully retaliated against him for his participation in the two DEO investigations.  If that's true, USF would not be entitled to summary judgment.  See Wright v. Southland Corp., 187 F.3d 1287, 1293 (11th Cir. 1999).  In support of his argument, Schoppman cites various statements that Koehler made while she was his supervisor.  For example, Koehler told Amiri that she "took care of . . . Fayson," and now Schoppman was "her problem."  Schoppman also points to evidence in the record that might suggest that Koehler was looking for ways to set him up to fail such as by giving him unreasonable deadlines and excluding him from meetings.  The problem with Schoppman's direct evidence argument is that although the evidence might suggest that Koehler wanted to get rid of him, it does not directly prove that she wanted to get rid of him because of his two DEO interviews.  See Hamilton, 680 F.3d at 1320  ("Direct evidence . . . is evidence which reflects a . . . retaliatory attitude correlating to the . . . retaliation complained of by the employee and that, if believed, proves the existence of a fact without inference or presumption.") (quotation marks omitted).  In other words, Schoppman has not pointed to any direct evidence that Koehler issued him the

7

letter of non-reappointment because of his participation in the two DEO interviews.

## B.

Schoppman contends that he can also survive summary judgment based on circumstantial evidence of unlawful retaliation.  We evaluate his claim using the familiar McDonnell Douglas framework.  Brown v. Ala. Dep't of Transp., 597 F.3d 1160, 1181 (11th Cir. 2010).  Under that framework, Schoppman must first establish a prima facie case by showing that:  (1) he participated in a protected activity; (2) he suffered an adverse employment action; and (3) there is a causal link between his participation in the protected activity and the adverse employment action he suffered.  Id.  For purposes of USF's motion for summary judgment, both parties assume that Schoppman's two interviews were protected activities and that his non-reappointment was an adverse employment action.   Accordingly, to determine whether summary judgment was appropriate, we must decide only whether Schoppman presented evidence from which a jury reasonably could conclude that his participation in the two DEO interviews and his non-reappointment were causally related.

Schoppman's first DEO interview occurred on March 30, 2007.  Koehler began the process of issuing his letter of non-reappointment nearly one year later, on March 27, 2008.  A time period of a few days short of one year between the

protected activity and the adverse employment action is far too long to infer a causal link in the absence of other evidence of causation. See Thomas v. Cooper Lighting, Inc., 506 F.3d 1361, 1364 (11th Cir. 2007) (three-month period too long to infer a causal link). Schoppman contends that he has established the causation element because he presented evidence that Koehler knew that he was interviewed in connection with the Fayson/Larkin DEO investigation. But proof that Koehler knew about Schoppman's participation in the investigation does not prove that his participation was the cause of her decision to non-reappoint him. See McCann v. Tillman, 526 F.3d 1370, 1376 (11th Cir. 2008) (stating that to establish the third element of a prima facie case of retaliation, the plaintiff must "demonstrate that the decision-makers were aware of the protected conduct, and that the protected activity and the adverse action were not wholly unrelated") (emphasis added) (alterations and quotation marks omitted). Accordingly, there is no genuine issue of material fact as to whether Schoppman's participation in the first DEO interview and his non-reappointment were causally related.

Schoppman's second DEO interview occurred on March 25, 2008, just two days before Koehler began the non-reappointment process. Two days is certainly a short enough period of time from which to infer a causal link. See Thomas, 506 F.3d at 1364 ("The burden of causation can be met by showing close temporal proximity between the statutorily protected activity and the adverse employment

9

action."). Proximity in time, however, even with a time period as short as the one here, does not always give rise to an inference of causation. As we have explained, "temporal proximity alone is insufficient to create a genuine issue of fact as to causal connection where there is unrebutted evidence that the decision maker did not have knowledge that the employee engaged in protected conduct." Brungart v. BellSouth Telecomms., Inc., 231 F.3d 791, 799 (11th Cir. 2000). Koehler testified in her deposition that she did not know that Schoppman was interviewed on March 25, 2008. In fact, she testified that she did not find out about that interview until she received the report from the DEO on April 8, 2008, which was after she had already started the non-reappointment process. And although Schoppman did not receive his letter of non-reappointment until after Koehler had found out about the second DEO interview, "[e]mployers need not suspend previously planned [personnel actions] upon discovering that [an employee has participated in a protected activity], and their proceeding along lines previously contemplated . . . is no evidence whatever of causality." Clark Cnty. Sch. Dist. v. Breeden, 532 U.S. 268, 272, 121 S.Ct. 1508, 1511 (2001).

In an attempt to show a genuine issue of material fact as to Koehler's knowledge about his participation in the second DEO interview, Schoppman points to Koehler's testimony that she assumed that Schoppman would be interviewed in connection with the investigation because she assumed that all of the employees in

10

the office would be interviewed.  He also points to evidence that all of the admissions office employees were required to write on a white board when they were leaving the office, where they were going, and how long they would be gone. But there is no evidence that Schoppman wrote that he was going to an interview with a DEO investigator, nor is there any evidence that Koehler looked at the white board that day.  Finally, Schoppman points to evidence that Koehler contacted DEO investigators in an attempt to determine who was going to be interviewed as part of the investigation.  There is, however, no evidence that anybody from the DEO told Koehler that Schoppman was going to be interviewed, and the only evidence in the record on the matter shows that DEO employees refused to tell Koehler the names of people they were interviewing.  At best, the evidence suggests that Koehler suspected that Schoppman might be interviewed, not that she knew he was.  That is insufficient to create a genuine issue of material fact as to the causation element.  See Clover v. Total Sys. Servs., Inc., 176 F.3d 1346, 1355 (11th Cir. 1999) (stating that "pure speculation" is not enough to infer a causal link even when the participation in a protected activity and the adverse employment action are close in time).

Schoppman has not presented sufficient evidence to create a genuine issue of material fact that his participation in either of the two DEO investigations caused

11

his non-reappointment.  He therefore has not established a <u>prima facie</u> case of

retaliation.  USF was and is entitled to summary judgment.

**AFFIRMED.**[1]

---

[1] USF's motion to strike Schoppman's reply brief and file a supplemental brief is **DENIED** as moot.