**NOT FOR PUBLICATION**

In the

United States Court of Appeals

For the Eleventh Circuit

————————————

No. 22-11433

————————————

DEMETRIC KING,

*Plaintiff-Appellant,*

*versus*

CITY OF SYLVESTER GEORGIA,
RAYMOND DRENNON,
 In his individual capacity,

*Defendants-Appellees,*

AUTRON HAYES, et al.,

*Defendants.*

————————————

Appeal from the United States District Court
for the Middle District of Georgia
D.C. Docket No. 1:20-cv-00080-LAG

————————————

Before ROSENBAUM, ABUDU, and WILSON, Circuit Judges.

ABUDU, Circuit Judge:

Demetric King appeals the district court's grant of summary judgment in favor of the City of Sylvester, Georgia, and his former supervisor, Police Chief Raymond Drennon (collectively, the "Defendants").  King sued Defendants in an action alleging race discrimination and retaliation under 42 U.S.C. §§ 1981 and 1983, Title VII of the Civil Rights Act of 1964, and the Family and Medical Leave Act ("FMLA").[1]  The district court determined that King failed to put forth evidence that Defendants' proffered reason for terminating him was mere pretext.  It also found that King failed to show that race was a motivating factor in either his demotion or termination under *McDonnell Douglas* or the convincing mosaic standard.  Lastly, as it relates to King's FMLA and Title VII retaliation claims, the court ruled that King had not provided evidence that the reasons for his demotion and termination were pretextual.  After careful review of the record, and with the benefit of oral argument, we affirm.

## I.      FACTUAL BACKGROUND [2]

Demetric King, an African-American male, worked for the Sylvester Police Department from May 1, 1997, until his termination on June 19, 2019.  During his 22-year tenure, King's supervisors

---

[1] King's initial complaint also brought a discrimination claim under the Age Discrimination in Employment Act ("ADEA").  However, he later abandoned that claim.

[2] At summary judgment, we consider all evidence in the record—pleadings, depositions, interrogatories, affidavits, etc.—in determining whether there is a genuine issue of material fact.  *See Tippens v. Celotex Corp.*, 805 F.2d 949, 952 (11th Cir. 1986); *see also* FED. R. CIV. P. 56(c).

disciplined him on various occasions.  They documented his disciplinary history through disciplinary action forms, which King referred to as "write-ups."

King began his career as a patrol officer in 1997, and he was promoted to lieutenant after seven or eight years.  In 2005, a senior officer submitted a disciplinary action form to the Department because King was sleeping and spending excessive time on his phone while on a late-night patrol.  The next night, the same senior officer submitted another disciplinary action because King failed to check on a property, despite previously being told to do so.[3]  A year later, King left his "gun belt" and weapon unattended and unsecured in a men's locker room.  As his punishment, a captain submitted a disciplinary action and issued King a written reprimand.  In 2010, a different captain submitted a disciplinary action and orally reprimanded King because he failed to respond to a 911 call while on duty.  King explained he missed the call because his radio was off.

A year later, a captain suspended King and his trainee after King requested that the trainee forward him nude photos of a woman while on patrol.  King's supervisor discovered his behavior because the trainee entered the wrong phone number when he attempted to forward the photos.  Instead of forwarding the nude photos to King, he sent them to a counselor at the local middle

---

[3] King noted this second disciplinary action was "not a legal write-up."  He explained that the disciplinary form remained unsigned by a "disciplinary authority," i.e. the Chief of Police, and he did not receive any disciplinary action as a punishment.

school.  In the same month as that incident, a supervisor submitted a disciplinary action because King had misused the Department's sick leave policy.  The supervising officer recommended a one-day suspension and noted King "lack[ed] concern for following orders, chain of command[,] and policy."

Despite his work history, King was promoted to lieutenant after being with the Department for sixteen years.  He held the position for only one year because the Department reorganized and designated King as a Senior Sergeant.  Thus, King was twenty years into the job and now promoted to a supervisory role despite his previous disciplinary record.

In 2017, a supervisor submitted a disciplinary action because King failed to supervise one of his subordinate officers.[4]  As his punishment, King received "written counseling," which was a disciplinary form that was intended to "bring [King's] attention [to] the severity of [the] situation."

Just a little over a month later, King violated a Department policy that forbade officers from publicly criticizing the Department in any way that "tends to impair [the Department's] efficiency."  King reportedly violated the policy by reaching out to a city councilman to complain about the chief of police's leadership

---

[4] King filed a grievance after receiving a disciplinary action for his failure to supervise.  In that document, he claimed that "he didn't witness [and] didn't know about" his subordinate's inappropriate behavior.  Though we note it as part of his disciplinary history, we do not credit it against him in considering if Defendants proffered a legitimate reason for terminating him.

rather than using the Department's formal grievance procedures. The chief found out about King's violation through other city officials who had heard King's critiques of the chief's leadership and the Department. The chief launched an internal investigation, which concluded that "King ha[d] attempted to drive a wedge between the City's officials and the Chief of Police." The chief viewed King's actions as a clear violation of the policy, which made him unfit for leadership in the Department. He explained, "[N]o one should call themselves a leader of men if they have to use manipulation and deceit to influence others." Accordingly, the chief demoted King, though he was reinstated after appealing the chief's decision.

Within a year, the chief had demoted King again. This time, the chief downgraded King from captain to lieutenant for "conduct unbecoming" an officer. Specifically, during the hiring process for new staff, King advised an applicant that she should delete a video of her fighting that she had posted on Facebook so that it would not come to light during her background check.

Raymond Drennon, who is White, became the chief of police in August 2018. King was a captain at the time Chief Drennon arrived. According to King, Chief Drennon only wanted the Department to employ White executive officers, yet at the time that Chief Drennon started, there were four non-White supervising officers—King, Anna Torres, Jonathan Luna, and Leon Billington.

Overall, King believed that Chief Drennon sought to justify his eventual termination through disciplinary actions that he did

not deserve. He claimed that Chief Drennon's first unlawful disciplinary action came from a reportedly unfounded claim of sexual harassment, which was filed by Officer Elizabeth Lawson. Officer Lawson explained that King responded to her requests for sick leave while pregnant with "derogatory statements." For this offense, Chief Drennon wrote a letter to King, which was considered a formal "reprimand and counseling" for "creating a hostile work environment." Next, King highlighted Chief Drennon's request that King patrol the Shipp Senior Center, a location known for high drug use. Chief Drennon had instructed King and other patrol supervisors to check the Shipp Center "several times a night" and submit a report detailing how many times the location had been checked. In over three months, King never submitted a report to Chief Drennon.[5] Similarly, when Chief Drennon started, he asked King to perform hiring responsibilities for the Department, which included screening applications, performing background checks, and participating in applicant interviews. The Department determined that King had failed at those responsibilities too, having only processed four applications in four months.[6]

Ultimately, Chief Drennon demoted King from captain to sergeant on March 25, 2019. The "Notice of Disciplinary Action"

---

[5] King disputed Chief Drennon's assertion that he never completed a report on the Shipp Center and noted that he instructed his subordinates to monitor the area.

[6] Chief Drennon admitted that King "did not get much instruction" in conducting the task, but also noted that King did not perform the simplest parts of his role for which he did have instruction.

stated that King's demotion was due to "inefficiency" and "negligence" in "performing assigned duties."  Chief Drennon wrote a letter to King and elaborated on the reasons for the demotion.  He explained that he had to remind King "numerous times" to complete reports in a timely manner.  Chief Drennon further stated that King's failure to complete reports promptly showed "a complete lack of effort," "demonstrated that he did not care if the job g[ot] done," and exhibited a "lack of commitment to doing things [Drennon] had asked [King] to do."  Chief Drennon explained that, after reviewing King's personnel file and learning that King's past supervisors had raised similar complaints about King's work performance, he concluded that King "had not shown the ability or skills it takes to lead the Patrol Division" despite being with the Department "for more than 20 years."  Chief Drennon wrote that although King had completed "Executive Training through the Georgia Chiefs of Police Association" and had extensive "experience and training," he failed to complete "basic tasks."

Within two days of his demotion, King filed an Equal Employment Opportunity Commission ("EEOC") Charge of Discrimination, alleging that he was demoted because of his race.  Chief Drennon learned about the charge soon after.  At this point, King claimed, Chief Drennon had organized a file with all of King's disciplinary actions to justify his eventual termination.   In particular, King challenged the basis for the sexual harassment accusations against him.  He explained the complaint was racially motivated because "he was a [B]lack [man] accused of sexually harassing a

[W]hite woman." King, however, acknowledged that Officer Lawson had previously accused another officer, who was White, of sexual harassment as well. However, he highlighted that the White officer was neither suspended nor demoted. Notably, as King himself admitted, he too was neither suspended nor demoted after Officer Lawson's complaint.

King also accused Chief Drennon of routinely placing White officers in supervisory positions over him, including Lieutenant Doug Brooks, who ultimately replaced King as captain. King also asserted that Chief Drennon disciplined him more harshly than White officers. As an example, he cited to Lieutenant Brooks whom he claimed regularly spent hours at the city-owned repair shop instead of performing patrol duties, a fact King believed Chief Drennon knew but never addressed.

King appealed his demotion, but the City upheld it. He worked in his demoted position for two weeks after he filed his EEOC charge, but then took approved leave under the FMLA on April 10, 2019.

While King took FMLA leave, Chief Drennon investigated complaints against two school resource officers who perpetually reported late for work. Both officers were under King's supervision. One of the officers had been late to work on fifty-two of the sixty-five days he was supposed to be on duty, and the other had been late thirty-six out of sixty-six days.

King also claimed that Chief Drennon began to build a file of King's past disciplinary failures while he was on leave. Within

that file, Chief Drennon included every recorded disciplinary action prior to Chief Drennon's arrival. He also added newly drafted summaries of King's past disciplinary actions that briefly explained King's entire disciplinary history. King believed the old records and new summaries should not have been included in his employment file because the recorded disciplinary actions dated so far back.

King also reported that Chief Drennon "harassed" him about work issues while he was on sick leave from April 10, 2019, through May 24, 2019. Specifically, Chief Drennon instructed King to bring his police vehicle to the station because it had a factory recall. Chief Drennon also instructed King to come into the station to sign a disciplinary form; otherwise he would note a "refusal" to sign the disciplinary paperwork. He then called to ask King follow-up questions about the Shipp Senior Center patrol issues. Lastly, Chief Drennon sent Lieutenant Brooks to King's home to ask when he would return from medical leave.

When King did return from FMLA leave, he was put on night shift as a patrol sergeant, supervising the patrol officers on that shift. Shortly after, the District Attorney's Office notified Chief Drennon that a local resident had made a Facebook post that accused a police officer of being parked outside his house, "blaring music and getting his d*** sucked by two 911 dispatchers." Lieutenant Nicole White, the officer in charge of internal investigations, reviewed the complaint. Lieutenant White confirmed King's vehicle had been parked outside Thornton's home from 2:24 A.M. to

4:59 A.M. When Thornton and his friend, Jake Waltman, were interviewed, they stated that they could not see inside the patrol vehicle because it was so dark, but Thornton said he heard women's voices. Thornton also claimed the music was so loud that it woke up the children in the house. King did not dispute that he parked at the described location for around two and a half hours or that he was playing music in his vehicle. However, King contended that he was reading the Bible and listening to gospel music. He maintained that he did not have the music blaring and denied that anyone was ever in the patrol car with him. He also noted the three witnesses who testified against him were all White. Lieutenant White concluded that her investigation, in relevant part, sustained the complaint and recommended disciplinary action against King. That same day, Chief Drennon recommended King's termination.

Chief Drennon wrote a letter to King explaining that although the investigation into the complaint "showed there was no proof a sexual act took place," "sitting on Sutton Drive for two and [a] half hours, playing music loud[ly] while doing nothing" is not how a Shift Supervisor should conduct himself while on duty. Chief Drennon went on to explain that after considering the District Attorney's complaint, along with King's extensive disciplinary history, he had decided to terminate King's employment.

King subsequently amended his EEOC charge and alleged that he had been terminated because of his race, age, and disability in retaliation for filing the first EEOC charge. King stated that he knew his termination was based on race because he was the only

African-American executive officer there, and Drennon wanted him out of that position. He claimed that Chief Drennon had removed another African-American supervising officer, Leon Billington, who, according to the Department, was fired for committing domestic violence against his wife while on duty.

Further, King claimed that Chief Drennon was known for using the N-word, despite never hearing the Chief use the N-word himself. King's allegation was based on the statements of two coworkers, Gloria Williams and Betty Jackson, who claimed they had heard Chief Drennon use such language. Jackson explained that she and two other staff members were in the Department one afternoon when they overheard Chief Drennon using the N-word while "joking around" with Lieutenant Brooks. Williams explained that the Chief used the N-word in reference to a "heavy" White male who had tried to avoid a speeding ticket the day before. When Williams and Jackson confronted the Chief about his use of the N-word, he denied using it and stated that "he wouldn't say anything like that."

King also noted that the officers who led the Department's investigation into his alleged misconduct had demonstrated racial prejudice in the workplace, including Lieutenant White whom he also accused of using the N-word in the workplace. In addition, King challenged Chief Drennon's decision to credit the account of three White witnesses over his testimony. King ultimately appealed his termination to the City Manager pursuant to the City of Sylvester's Personnel Policy, but the city sustained his termination.

## II.    PROCEDURAL HISTORY

King initially filed his racial discrimination and retaliation suit against the City, Chief Drennon, the City Manager Autron Hayes, and former Police Chief Anson Evans.  The City and Chief Drennon filed an answer, while Hayes and Evans moved to dismiss for failure to state a claim.  The court granted Hayes and Evans' motion, leaving only the City and Drennon as defendants.

Following discovery, Defendants moved for summary judgment on the remaining claims.  They argued King could not make a *prima facie* showing of racial discrimination because he had not identified any similarly-situated "comparators" who had been treated more favorably; specifically, anyone who had a similar length of service and record of disciplinary infractions when compared to King.  They further asserted that his claims would also be unsuccessful under a convincing mosaic framework because there was nothing suspicious about the timing of his termination, and the reasons given were not ambiguous.  In addition, they contended that, because the basis for his firing was valid, he could not prove pretext.  As for King's FMLA and Title VII retaliation claims, Defendants asserted King had not established a causal connection between either his EEOC charge or FMLA leave, and his termination.

In response, King maintained summary judgment was inappropriate on his discrimination claims given outstanding genuine disputes regarding the racial motivations behind the adverse actions Defendants took against him.  As for his retaliation claims, King relied on the temporal proximity between both his EEOC

charge and FMLA leave in relation to his ultimate termination. The district court granted summary judgment in favor of Drennon and City of Sylvester on all claims. King now appeals, challenging the district court's judgment on his racial discrimination claims and respective claims of retaliation under Title VII and the FMLA.

### III.    STANDARD OF REVIEW

We review the district court's grant of summary judgment *de novo*, viewing all facts and subsequent inferences in the light most favorable to the non-movant. *See Alvarez v. Royal Atl. Devs., Inc.*, 610 F.3d 1253, 1263–64 (11th Cir. 2010). Summary judgment is only appropriate if there is no genuine dispute of material fact, and a party is entitled to judgment as a matter of law. *Guevara v. Lafise Corp.*, 127 F.4th 824, 828–29 (11th Cir. 2025); FED. R. CIV. P. 56(a). A mere "scintilla of evidence" in support of the nonmovant's position is not sufficient to avoid summary judgment. *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990). Instead, "there must be enough of a showing that the jury could reasonably find for that party." *Id*.

### IV.    DISCUSSION

We proceed with our discussion in four parts. First, we explain why King's discrimination claims fail under the *McDonnell Douglas* framework. Second and third, we explain that King failed to establish a convincing mosaic of circumstantial evidence, even under a mixed motive theory, to survive summary judgment.

Lastly, we explain that King proffers insufficient evidence for a reasonable jury to find a causal connection between his protected activities and Defendants' adverse employment actions.

A. *King's Claims of Racial Discrimination Fail Under the* McDonnell Douglas *Framework.*

Because the parties' burdens under Title VII and Sections 1981 and 1983 are the same, we address all of those claims together. *See Lewis v. City of Union City*, 918 F.3d 1213, 1217 (11th Cir. 2019) (*en banc*). A plaintiff who brings a claim of racial discrimination may survive summary judgment by satisfying the burden shifting framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 804 (1973). Under that framework, a plaintiff has the initial burden to establish his *prima facie* case. *Lewis*, 918 F.3d at 1220-21. To satisfy that burden, the plaintiff must show—(1) he belongs to a protected class; (2) he was qualified for the job; (3) he was rejected from the job, despite meeting those qualifications; and (4) his employer treated similarly-situated employees who were outside of the protected class more favorably. After the plaintiff establishes a *prima facie* case, the burden shifts to the employer who must give a "legitimate, nondiscriminatory" reason for its adverse action. *Id.* at 1221. If the employer gives a sufficient reason, the burden then shifts back to the employee who must prove the reason given was pretextual. *Id.*

In order to establish an employer's proffered reason is mere pretext, a plaintiff must cast doubt on whether the employer proffered a truthful justification. *See Combs v. Plantation Patterns*, 106

F.3d 1519, 1528 (11th Cir. 1997). Specifically, the plaintiff must cast enough doubt for a reasonable factfinder to find that the employer's proffered justification is not credible. *See Jackson v. State of Ala. State Tenure Comm'n*, 405 F.3d 1276, 1289 (11th Cir. 2005). A reasonable factfinder could make that determination if the employee highlights "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions . . . ." *Id.* (quoting *Combs*, 106 F.3d at 1538). In short, the plaintiff must create a genuine dispute of fact regarding the employer's proffered reason for adverse action. *See id.* at 1291.

Here, the parties do not dispute King is a member of a protected class, was qualified for the position when hired, and experienced an adverse employment action. The parties, however, do dispute whether King proffered a valid comparator who is similarly-situated in all material aspects. We find that King did not.

King argues that Lieutenant Brooks qualifies as a valid comparator because, he too, had previously failed to perform patrol duties while engaged in activities unrelated to work. King's argument fails given a valid comparator will typically share the plaintiff's disciplinary history and have been subject to discipline from the same supervisor. *Lewis*, 918 F.3d at 1227. There is no evidence in the record that Lieutenant Brooks shared the same lengthy disciplinary record as King, who had been demoted a mere three months earlier for his failures under Chief Drennon. Further, the record reflects that Lieutenant Brooks and King were subject to different direct

supervisors. King reported to Chief Drennon while Lieutenant Brooks reported to King.

Even if King could establish a *prima facie* case, Defendants proffered a legitimate, nondiscriminatory reason for King's termination. In support of their decision, Defendants rely on King's extensive disciplinary record and his failure to perform patrol duties in light of that record. Specifically, Defendants highlight King's behavior on the night that he returned from leave and joined the patrol unit. The Department investigated the incident and concluded that King sat on patrol, in a low-crime area, for "two and [a] half hours, playing loud music while doing nothing." That sort of dereliction while on duty might legitimately motivate a reasonable employer to terminate its employee, especially considering it was King's first night on patrol after being demoted.

Since Defendants proffered a legitimate, nondiscriminatory reason for terminating King, he has to show that a reasonable jury could find that Defendants' reasons were pretextual. *Combs*, 106 F.3d at 1528. King first challenges Chief Drennon's investigation of the patrol incident which took place on his first night back from leave. King specifically challenges Chief Drennon's reliance on the testimony of three White witnesses over his own. This argument fails because we credit, for example, King's assertion that there were no women present in the vehicle and that no sexual acts occurred. However, even taking those facts in his favor, King admittedly sat in a low-crime area for two and a half hours and read a book in his patrol car. Further, King fails to demonstrate that his

previous disciplinary infractions, which also justified his termination, were mere pretext. Thus, King fails to demonstrate that either his behavior on patrol or previous disciplinary actions were mere pretext to terminate him.

King also argues that Lieutenant White's and Chief Drennon's alleged used of the N-word discredits Defendants' proffered reason for his termination. However, King never claims that Chief Drennon or White called him the N-word, and the record shows that if he did use the word, he used it in reference to a White person. Moreover, the record does not reveal that the use of such language was often, let alone pervasive, in showing that King was discriminated against based on his race.

King argues that even if his disciplinary record justified his demotion, his ultimate termination was unwarranted and unlawful. However, the record belies his arguments. First, as we have already articulated, King's behavior on duty was a legitimate reason to terminate him, even if we accept his version of the facts. *Alvarez*, 610 F.3d at 1263 (noting that poor job performance is a legitimate reason to fire an employee). Second, King's argument is factually flawed because the Chief noted further infractions after he demoted King, especially with respect to his supervision of other officers. For example, King was responsible for subordinates who frequently failed to report to work on time. So even without King's troubling record, Chief Drennon's subsequent discoveries of his failure to supervise provided an additional legitimate reason to terminate him.

King must also confront Defendants' reason for his demotion and show that the asserted reason was mere pretext. *See Crawford v. Carroll*, 529 F.3d 961, 970 (11th Cir. 2008) (explaining that a demotion, like a termination, is protected from racial discrimination under Title VII). Defendants say that King was demoted for his extensive, flawed disciplinary history, which they claim is a legitimate, nondiscriminatory reason to demote an employee. King, on the other hand, argues that his disciplinary history was not as flawed as it appears. He points to several instances where he contested past disciplinary actions, and he suggests that these contests demonstrate that his record is less extreme than it may appear at first glance.

Even assuming King is right, and his record is not as extensive as Defendants claim, he still fails to demonstrate the proffered reason for his demotion was mere pretext. Here, King had multiple disciplinary issues during his time working under Chief Drennon. The Chief cited a plethora of frustrations that he had experienced first-hand while supervising King—sexual harassment claims, unsubmitted reports, failure to supervise, failure to patrol dangerous areas, and failure to perform hiring duties. In his brief, King only disputed the veracity of one of these incidents under Chief Drennon's tenure—Officer Lawson's sexual harassment claim. Even there, King did not show that Chief Drennon did not, in fact, believe that King had engaged in that alleged misconduct. Plus, Chief Drennon's other frustrations also remain as legitimate, nondiscriminatory reasons to demote King for which he provides no evidence of pretext.

In short, King did not meet his burden of showing that Defendants' reasons for demoting and terminating him were pretextual. Here, King's extensive disciplinary record, even taking all facts in King's favor, support Defendants' decision.

> ### B. King Fails to Present a Convincing Mosaic of Evidence to Demonstrate that Race was a Motivating Factor in Either His Demotion or Termination.

The convincing mosaic framework and *McDonnell Douglas* test are alternative paths to answer the same question—whether the plaintiff has proffered sufficient evidence for a reasonable jury to find that his employer terminated him for illegally discriminatory reasons. *See McCreight v. AuburnBank*, 117 F.4th 1322, 1334-35 (11th Cir. 2024). "[T]he 'convincing mosaic' analysis—despite its flowery language—is a stand-in for the Rule 56 summary judgment standard applied to employment discrimination." *Ismael v. Roundtree*, 161 F.4th 752, 760 (11th Cir. 2025). Accordingly, "a plaintiff may avoid summary judgment by presenting a wide range of circumstantial evidence" of racial discrimination. *Id.*

King argues that a reasonable jury could infer that his race was a motivating factor in Defendants' decision to demote and terminate him given the Department's reorganization which he claimed removed officers of color from supervisory positions, Chief Drennon and Lieutenant White's use of the N-word in the workplace and the systematically better treatment White employees received.

Even under the more lenient convincing mosaic lens, King's argument still fails for the reasons already stated.  *Cf. Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 457 (2006) (per curiam) (ruling that the employer's use of the term "boy" was evidence of racial animus when that employer had used the term to reference several employees); *cf. Jenkins v. Nell*, 26 F.4th 1243, 1251 (11th Cir. 2022) (holding that an African-American supervisor's racially-biased comments about his White employees was circumstantial evidence to support an inference of racial discrimination).

Next, we turn to King's evidence that Chief Drennon reorganized the Department to remove minority officers from supervisory positions and systematically treated White employees better. King claims Chief Drennon fired another African-American supervising officer—former officer Billington—because of his race, but he minimizes that Billington reportedly abused his wife while on the job and had been fired for doing so.

Relatedly, King claims that Chief Drennon removed half of the minority supervising officers and sought to replace them with White leadership, but the record does not support his assertion.  In reality, Drennon only demoted Officer Torres when he reorganized the Department.  The demotion of one minority supervisor, without more, is insufficient to demonstrate that Defendants systematically treated White employees better than African-American employees.

King also claims Chief Drennon gave him additional responsibilities that he did not know how to perform while decreasing the

workload of other White supervising officers, so he would fail. While King acquired more hiring duties during the Department reorganization, White officers also acquired more responsibilities at that time. For example, Lieutenant White went from being one of four investigators at the Department to the sole investigator. Accordingly, no reasonable jury could find that King's additional duties reflected an intent to remove African-American supervisors.

Thus, considering all evidence, a reasonable jury could not find that race was a motivating factor in either his demotion or eventual termination.

C. *King Fails to Show a Causal Connection Between His Termination and Either His EEOC Charge or FMLA Leave.*

King claims he was terminated because he filed an EEOC charge against the Department and took FMLA leave. Title VII and the FMLA prohibit an employer from engaging in any adverse employment actions against an employee because he opposed an unlawful practice under the respective statutes. *See* 42 U.S.C. § 2000e-3(a); 29. U.S.C. § 2615(a)(2). Absent direct evidence of retaliation, courts employ the *McDonnell Douglas* framework when analyzing claims for retaliation based on circumstantial evidence. *See Brown v. Ala. Dep't of Transp.*, 597 F.3d 1160, 1181 (11th Cir. 2010); *Martin v. Brevard Cnty. Pub. Schs.*, 543 F.3d 1261, 1268 (11th Cir. 2008) (per curiam). As with the *McDonnell Douglas* framework applicable to discrimination cases, a plaintiff bears the burden of establishing a *prima facie* case of retaliation. *Brown*, 597 F.3d at 1181. To establish a *prima facie* case of retaliation, a plaintiff must show

that: (1) they engaged in a protected activity, (2) they suffered an adverse action; and (3) there was a causal connection between his protected activity and the adverse action. *Id.*

i.    Retaliation under Title VII

King satisfies the first two elements of his Title VII claim because he engaged in protected activity when he filed his EEOC charge on May 27, 2019, and he suffered an adverse employment action when he was terminated on June 6, 2019. However, King's retaliation claim begins to crack at the third element—causation.

To sufficiently satisfy a causal connection, the plaintiff must show that (1) the decisionmakers knew of the protected activity, and (2) the protected activity and adverse action were not wholly unrelated. *See Shannon v. Bellsouth Telecomms., Inc.*, 292 F.3d 712, 716 (11th Cir. 2002). Ultimately, an employee "must demonstrate that her protected activity was a but-for cause of the . . . adverse action by the employer." *Gogel v. Kia Motors Mfg. of Ga., Inc.*, 967 F.3d 1121, 1135 (11th Cir. 2020) (*en banc*) (citation omitted). The burden of alleging causation can be satisfied by factual allegations that show close temporal proximity between the protected activity and the adverse employment action. *See Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007) (per curiam). However, "mere temporal proximity, without more, must be 'very close.'" *Id.* (quoting *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (per curiam) (internal citations omitted)). Further, even if the employee establishes a sufficient causal connection, it may be under-

mined by evidence of a superseding cause which prompted the adverse decision. *See Berry v. Crestwood Healthcare*, 84 F.th 1300, 1309 (11th Cir. 2023).

King fails to satisfy his *prima facie* case for his retaliation claim. Even if the time between his filed EEOC charge and termination were "very close," Chief Drennon ultimately terminated King due to the superseding event between his EEOC charge and subsequent termination—the District Attorney's complaint regarding King's behavior while on patrol. *See id.* (holding that employee misconduct was an intervening cause that severed any preexisting causal inference). Thus, King did not satisfy his initial burden of showing that the filing of his complaint and his termination were not "wholly unrelated."

### ii.     Retaliation for FMLA Leave

Like his Title VII retaliation claim, King's FMLA claim also falters at causation. He established the first two elements for a *prima facie* case—he engaged in a protected activity, taking FMLA leave, and he suffered an adverse employment action, his termination. Moreover, there is an argument that King's use of medical leave and his termination are temporally proximate. *See Thomas*, 506 F.3d at 1364. Even so, King has not proffered evidence to rebut the superseding cause of his termination—his documented history of violating Department policies and the dereliction of his duties. King's failure prevents him from satisfying his *prima facie* showing of retaliation. Accordingly, the district court did not err in granting summary judgment in favor of Defendants as to this claim as well.

## V.    CONCLUSION

For the reasons set forth above, we **AFFIRM** the district court's grant of summary judgment in favor of the City and Chief Drennon.

**AFFIRMED.**